No. # 21 - 15151
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

George Jarvis Austin,

*Plaintiff-Appellant [or Plaintiff-Appellee]*,

v.

Tesla, et. al.

*Defendant-Appellee [or Defendant-Appellant]*.

On Appeal from the United States District Court
for the Northern District of California
No.3:20:00800
Hon. District Judge Chen

## APPELLANT'S OPENING BRIEF

George Jarvis Austin, esq. (TBA). Pro Se
2107 Montauban Ct., Stockton, CA
209.915.6304,
gaustin07@berkeley.edu
*Appellant, Pro Se*

# DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Appellant, Pro Se, George Jarvis Austin, as an Individual

person does not have to file a Disclosure Statement.  However, Defendants Tesla,

Balance Staffing, and Personnel Staffing Group, as joint employers, may all need

to. See FRAP 26.1(a).  Plaintiff has removed all other Defendants in light of

disclosures, reports, and payments, from the State of California, Auditing and

Accounting Department investigators.  Plaintiff initially included EDD under *"a*

*continuing violation of federal law"*, exception to the Eleventh Amendment per

their continued Civil Rights violations, prior to delayed payment, and they are now

removed as they have verified and paid Appellant George Jarvis Austin the

maximum weekly amounts based on audited and verified wages under joint

Employers' penalty of perjury.  See *California Department of Human Resources*

*Development v. Java, 402 U.S. 121 (1971) See also Ex Parte Young, 209 U.S. 123*

*(1908)*

Date:  8/13/21

George Jarvis (or J.) Austin
*/s/ George Jarvis (or J.) Austin*

Plaintiff-*Appellant, Pro Se*

ii

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT  ii

TABLE OF AUTHORITIES     v

JURISDICTIONAL STATEMENT     1

STATUTORY [AND REGULATORY] AUTHORITIES 1

ISSUE(S) PRESENTED 2

STATEMENT OF THE CASE 5

SUMMARY OF THE ARGUMENT 15

STANDARD OF REVIEW 19

ARGUMENT        20

    I.    Appellant, as Pro Se Litigant, and Student, should have been granted leave to Amend in the Interest of Justice, in light of the favorable facts for his case, circumstances, disclosures, and liberal standard to amend in Interest of Justice expressed in *Robertson v. Dean Witter, Sharkey v. O'neal, and Barnes v. Saul. 20*

        A. Any alleged deficiencies could be easily corrected by Mr. Austin. 22

        B. The necessary plead facts, disclosures, and elements taken in whole, can properly be deduced, and inferred from Appellants pleading by the Court. 23

    II.    Appellant's, pro se, pleadings of Joint Employers *FLSA* violations, regarding complained about unpaid overtime for multiple weeks, along with independently verified findings of fact per *General Order No. 71* disclosures, preliminary

authenticating, and buttressing, said pleadings was more than sufficient under this Circuit's *Landers* standard. 27

    A. Appellee/Defendant Employers, including publicly traded Tesla, are jointly responsible for Appellant, pro se's, plead *FLSA* wage violations, given key factors of control, scheduling, inspection, power to hire and fire, payroll, payment and supervision under *Chao, Espinoza, and Scalia. 31*

III.    Appellant, Pro Se's, protected activity (complaints to supervisors, HR, management, and company officers, etc.) regarding unpaid overtime, Health and Safety, and other violations for multiple weeks leading to adverse employment activity (wrongful termination based on defamatory false accusation of criminal recording), apparently as pretext, only days after meeting with HR Officer is sufficient under *FLSA* retaliation standard (as articulated by this Circuit's *Rosenfield*, and the Supreme Court's *Kasten*). 35

    A. Defendant Employers are jointly responsible for Retaliation and Civil Rights violations due to employer retaliation because of *FLSA* violation, and other Health and Safety Code complaints under joint employment doctrine, as well as extended, and shared, liability articulated in *Arias*. 45

CONCLUSION    48

STATEMENT OF RELATED CASES

CERTIFICATES OF COMPLIANCE & SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alvarez v. IBP, Inc.,*
    339 F.3d 894(9th Cir. Aug. 5, 2003),   40

*Arias v. Raimondo,*
    860 F.3d 1185 (9th Cir. 2017)       4,19,44,46,47 )

*Arredondo v. Delano Farms Co.,*
    No. 1:09-cv-01247-LJO-DLB,(E.D. Cal. Apr. 11, 2012)   32

*Ashcroft v. Iqbal,*
    556 U.S. 662, 679 (2009)        15, 19, 20

*Ballaris v. Wacker Siltronic Corp.,*
    370 F.3d 901, 908 (9th Cir. 2004)        24,30

*Barnes v. Saul,*
    No. 19-17203, at *2 (9th Cir. Dec. 30, 2020)        2, 15, 19, 20

*Barrentine v. Arkansas-Best Freight Sys.,*
    450 U.S. 728, 740-41,(1981).        26

*Berglund v. Canyon Cnty Case No.*
    1:19-cv-00396-CWD (D. Idaho Mar. 4, 2020)        47

*Boag v. MacDougall,*
    454 U.S. 364, 365, (1982)).        24

*Bonnette v. Cal. Health & Welfare Agency,*
    704 F.2d 1465, 1469 (9th Cir. 1983)        47

*Braxton v. Jackson Civil Action*
    No. DKC 18-1946 (D. Md. Sep. 20, 2019)        47

*Brennan v. Arnheim Neely, Inc.,*
    410 U.S. 512, 518, (1973)        34

*Brooklyn Sav. Bank v. O'Neil,*
    324 U.S. 697, 707,(1945),        25

*California Department of Human Resources Development v. Java,*
    402 U.S. 121 (1971)        ii

*Chao v. A-One Med. Servs., Inc.,*
    346 F.3d 908, 913-14 (9th Cir. 2003)  passim

*Christensen v. C.I.R, 786*

F.2d 1382, 1384-85 (9th Cir. 1986)          22, 23
*Cook, Perkiss & Liehe v. N. Cal. Collection Service,*
    911 F.2d 242, 247 (9th Cir.1990)          22
*Darveau v. Detecon, Inc.,*
    515 F.3d 334, 336 (4th Cir. 2008)          43, 46
*Depot, Inc. v. Caring for Montanans, Inc.,*
    915 F.3d 643, 652 (9th Cir. 2019)          19, 20
*Doe v. United States,*
    58 F.3d 494, 497 (9th Cir.1995)          21
*Donovan v. Grim Hotel Co.,*
    747 F.2d 966, 970 (5th Cir. 1984)          34
*E.E.O.C. v. White & Son Enterprises,*
    881 F.2d 1006, 1008 (11th Cir. 1989)  43
*Elder v. Holloway,*
    510 U.S. 510, 516,(1994).          25
*Eldridge v. Block,*
    832 F.2d 1132, 1137 (9th Cir. 1987)          24
*Erickson v. Pardus,*
    551 U.S. 89, 94 (2007).          19,21,23
*Esntion Records, Inc. v. Jonestm, Inc.,*
    No. 07-CV-2027-L, at *2 (N.D. Tex. Apr. 2, 2009) 22
*Espinoza v. MH Janitorial Servs.,*
    No. 76752-6-I, at (Wash. Ct. App. Nov. 4, 2019)          3,17,18,31,32
*Estacion v. Kaumana Drive Partners*
    No. 19-cv-00255 JMS-KJM (D. Haw. Oct. 18, 2019).          48
*Gordon v. City of Oakland,*
    627 F.3d 1092, 1094-95 (9th Cir. 2010)          25, 26
*Hamilton v. Brown,*
    630 F.3d 889, 892-93 (9th Cir. 2011)          21
*Heier v. Czika*
    NO. 5:19-cv-1955 (N.D. Ohio Aug. 18, 2020)          47
*Henderson v. City of Grantville, Ga.,*
    37 F. Supp. 3d 1278, 1281 (N.D. Ga. 2014)          43
*Hirst v. Gertzen,*
    676 F.2d 1252, 1264-65 (9th Cir. 1982)          15, 21

*Hughes v. Rowe,*
      449 U.S. 5, 9, (1980)                22

*Ashcroft v. Iqbal,*
      556 U.S. 662, 679 (2009)           14, 15, 19, 20, 21, 23

*James v. Price Stern Sloan, Inc.,*
      283 F.3d 1064 (9th Cir.2002),        1

*Karr v. Strong Detective Agency, Inc.,*
      787 F.2d 1205, 1208 (7th Cir. 1986)   35

*Kasten v. Saint-Gobain Performance Plastics Corp.,*
      563 U.S. 1, 14 (2011)           4,18,36,37,42,43, 44

*Lambert v. Ackerley,*
      180 F.3d 997, 1004 (9th Cir. 1999)        41-3,

*Landers v. Quality Commc'ns, Inc.,*
      771 F.3d 638, 640 (9th Cir. 2014)        passim

*Leddy v. Standard Drywall, Inc.,*
      875 F.2d 383, 387 (2d Cir. 1989)        33

*McDonnell Douglas Corp. v. Green,*
      411 U.S. 792 (1973))            40

*McLaughlin v. Richland Shoe Co.,*
      486 U.S. 128, 133, 108(1988)         39

*Miller v. Infinite Percent Partners ,*
      No. 20-cv-02253-HSG, at *4 (N.D. Cal. Feb. 3, 2021)          42-3

*Morley v. Walker,*
      175 F.3d 756, 759 (9th Cir. 1999).         27

*Onken v. W.L. May Co.,*
      300 F. Supp. 2d 1066, 1068 (D. Or. 2004)        42

*Pineda v. JTCH Apartments, L.L.C.,*
      843 F.3d 1062, 1063 (5th Cir. 2016)        43

*Plaintiff, v. FLAGSTAR CORPORATION and DENNY'S, INC.*,
      Civ. No. 93-20208-JW (Consolidated).        6

*Robertson v. Dean Witter Reynolds, Inc.,*
      749 F.2d 530, 541 (9th Cir. 1984)        2, 15, 20

*Rosenfield v. GlobalTranz Enterprises, Inc.,*
      811 F.3d 282, 286 (9th Cir. 2015)        passim

*Scalia v. Emp'r Sols. Staffing Grp.,*
    951 F.3d 1097, 1103 (9th Cir. 2020)    3,17,18,31,33

*Scherping v. Commissioner,*
    747 F.2d 478, 480 (8th Cir. 1984)    23

*SEIU, Local 02 v. County of San Diego,*
    60 F.3d 1346, 1356 (9th Cir. 1994)    39

*Sharkey v. O'Neal,*
    778 F.3d 767, 774 (9th Cir. 2015)    2,15, 20, 21

*Smith v. Jackson,*
    84 F.3d 1213, 1217 (9th Cir. 1996).    25

*Stegall v. Citadel Broad. Co.,*
    350 F.3d 1061, 1065-1066 (9th Cir. 2003)    41

*Tennessee Coal, Iron R. Co. v. Muscoda Local*
    No. 123, 321 U.S. 590,597-98, (1944);    29

*Torres-Lopez v. May,*
    111 F.3d 633 (9th Cir. 1997)    32, 33, 35,46

*Trustees of the Screen Actors Guild-PP & HP v. NYCA, Inc.,*
    572 F.3d 771, 776 n.4 (9th Cir. 2009)    32

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 558 (2007) at 555;    16, 23

*TwoRivers v. Lewis*,
    174 F.3d 987, 991 (9th Cir. 1999).    27

*Washington v. Garrett,*
    10 F.3d 1421, 1432 n.14 (9th Cir. 1993)    24

*Williamson v. General Dynamics Corp.,*
    208 F.3d 1144, 1147 (9th Cir. 2000)    1, 27-28,48

*Wirtz v. Hebert,*
    368 F.2d 139, 141-42 (5th Cir. 1966)  35

*Yee v. Escondido,*
    503 U.S. 519, 534,(1992).    25

*Zadrozny v. Bank of N.Y. Mellon,*
    720 F.3d 1163, 1167 (9th Cir.2013)    27

1

2                               **JURISDICTIONAL STATEMENT**

3           The jurisdiction for the lower court is proper due to Federal Question, 28

4   U.S.C. § 1331.  This Court of Appeals has jurisdiction under 28 U.S.C. § 1291)

5   James v. Price Stern Sloan, Inc., 283 F.3d 1064 (9th Cir.2002), Williamson v.

6   General Dynamics Corp., 208 F.3d 1144, 1147 (9th Cir. 2000).  Order and

7   Judgement, that Appellant appealed from, dismissing all Federal claims, and

8   withholding judgement for state law originating claims, was entered on

9   1/26/2021,  and timely notice of appeal was filed on the same day, 1/26/2021.

10  See Docket No. 95, 96.  The Ninth Circuit standard of review is de novo, Solis v.

11  Washington, 656

12  F.3d 1079, 1083 (9th Cir.2011)." Rosenfield v. Globaltranz Enters., Inc., 811 F.3d

13  282, 285 (9th Cir. 2015).

14
15
16                      **STATUTORY [AND REGULATORY] AUTHORITIES**

17          All other relevant statutory, constitutional, or regulatory authorities, and

18  other informational references shall appear in the Addendum to this brief"

19

20

21

22                                          1
23

## ISSUE(S) PRESENTED

25    The District Court chose to withhold judgment on issues arising out of state

26    law and instead focus on two main areas of Federal liability for Defendants: *FLSA*

27    violations, and Anti-Retaliation protections for Plaintiff's protected activity.

28    Thus, the main issues that arise are*:*

29    I.    Whether Appellant, as Pro Se Litigant, and Student, should have

30          been granted leave to Amend in the Interest of Justice, in light of the

31          favorable facts for his case, circumstances, disclosures, and liberal

32          standard to amend in Interest of Justice expressed in  *Robertson v.*

33          *Dean Witter, Sharkey v. O'neal, and Barnes v. Saul*.?

34          A. Whether Any alleged deficiencies could be easily corrected by

35             Appellant/Plaintiff?

36          B. Whether the necessary plead facts, disclosures, and elements

37             taken in whole, can properly be deduced, and inferred from

38          Appellants pleading by the Court?

39    II.   Whether Appellant's, pro se, pleadings of Joint Employers *FLSA*

40          violations, regarding complained about unpaid overtime for multiple

41          weeks, along with independently verified findings of fact per

42          *General Order No. 71* disclosures, preliminary authenticating, and

43          buttressing, said pleadings was more than sufficient under this

44          Circuit's *Landers* standard?

45          A. Whether Appellee/Defendant Employers, including publicly

46             traded Tesla, are jointly responsible for Appellant, pro se's,

47             plead FLSA wage violations, given key factors of control,

48             scheduling, inspection, power to hire and fire, payroll, payment

49             and supervision under *Chao, Espinoza, and Scalia*?

50    III.  Whether Appellant, Pro Se's, protected activity (complaints to

51          supervisors, HR, management, and company officers, etc.) regarding

52          unpaid overtime, Health and Safety, and other violations for multiple

53          weeks leading to adverse employment activity (wrongful termination

54          based on defamatory false accusation of criminal recording),

55          apparently as pretext, only days after meeting with HR Officer is

3

1          sufficient under FLSA retaliation standard (as articulated by this

2          Circuit's *Rosenfield*, and the Supreme Court's *Kasten*).

3          A. Whether Defendant Employers are jointly responsible for

4          Retaliation and Civil Rights violations due to employer

5          retaliation because of *FLSA* violation, and other Health and

6          Safety Code complaints under joint employment doctrine,

           as 7      well as extended, and shared, liability articulated in

           *Arias*?

8

9

10

11

12

13
14
15
16
17
18
19

20

# STATEMENT OF THE CASE

1

2

3   Note: Mr. Austin, Pro Se, is exempt from excerpts req.*See* Ninth Cir. R. 28-2.8.

4

5

6        Pro Se Plaintiff George Jarvis Austin filed a complaint against Tesla Motors,

7   Inc.1 ("Tesla"), Personnel Staffing Group, LLC2 ("PSG"), Balance Staffing

8   Workforce, LLC3 ("BSW"), and several individual defendants (collectively,

9   "Defendants") alleging nine causes of action arising out of work he performed as

10  an employee of all three joint employers at Tesla facilities. See Docket No. 18

11  (First Amended Complaint (FAC)).4   Prior to any filings, Mr. Austin reached out

12  to get service and assistance from Federal Pro Bono Project's Pro Se Help Desk as

13  Judge Spero later recommended, yet unlike what Judge Chen's opinion said,

14  falsely, Mr. Austin was actually denied service. See Docket No. 18; FAC at 17-18

15  In practice the denial of service from Pro Bono Project was analogous to Denny's

16  refusal of service (where Black customers were made to wait longer, and pay

17  more, or outright refused service) See Plaintiff, v. FLAGSTAR CORPORATION

18  and DENNY'S, INC., Civ. No. 93-20208-JW (Consolidated).  Mr. Austin

19    attempted to follow up multiple times, but they refused to serve after initially

20    providing him

21    with incorrect legal advice, yet he still utilized all available resources to him, and

22    was not discouraged due to others poor decision-making. FAC at 17-18.

23         Appellant, George Jarvis Austin, experienced negative employment action

24    (wrongful termination) less than a week (only days) after reporting wage, health

25    and safety, and other violations in HR meeting with HR Officer (after reporting for

26    multiple weeks).  Without evidence, conversation, escalation, or opportunity to

27    defend against false accusation, Appellant was there-after falsely accused of

28    recording an unnamed supervisor in violation of California's wiretapping laws

29    (apparently as pretext). See id. The accusation was not only false, and hypocritical

30    (but also retaliation for reporting violations of various state and federal

31    employment laws. See id"  While [jointly) employed by PSG, BSW and Tesla,

32    beginning in the summer of 2019 "up through 2020" Mr. Austin worked at Tesla.

33    See FAC at 2, 20.6  Pay discrepancies, labor violations and and a second set of

34    payroll checks containing Mr. Austin's personally identifiable information were

35    discovered by Mr. Austin. Id. at 21. These checks, compared with ledgers per basic

36    forensic accounting strategies, and early inquiry, helped identify unpaid wages

37    PSG, BSW, and Tesla, jointly owes Appellant. Id. See also Docket #20, #68

38    (Verified Plaintiff's wages, [and wage statements for Q3 and Q4] Plaintiff wages

39    for Q3 & Q4, with wages in Q4 totaling above the maximum benefit threshold of

40    $28,145.01 (for months October through December) triggering Plaintiffs

41    maximum benefit amount of $1,300 weekly due to out of work physical injury (car

42    accident -  See *Austin v*

43    *Kemper*[www.pacermonitor.com/public/case/40069998/Austin_v_Kemper_Corpor](http://www.pacermonitor.com/public/case/40069998/Austin_v_Kemper_Corporation_Insurance)

44    [ation_I nsurance](http://www.pacermonitor.com/public/case/40069998/Austin_v_Kemper_Corporation_Insurance) ); wages investigated and confirmed by Defendant Employers

45    via State of California Auditing and Accounting Department, Investigators under

46    penalty of perjury))

47             In addition to labor code violations, Mr. Austin noticed certain health and

48    safety violations and also reported them to "all involved organizations, and persons

49    responsible." Id. Part of complaint process, particularly health and safety code

50    violations was a series of internal reports and solutions platform where Mr. Austin

51    made 15+ complaints and provided solutions.  Some were done so well Tesla's

52   safety committee personally requested to meet, yet part of the retaliation was

53   interference, stalling, by supervisors and management to the actual meeting.

54          "Fair notice" to liable joint employer's was provided and response from

55   their representatives confirms they understood the level of seriousness of

56   complaints.

57   One said as mentioned "you are barking up the wrong tree," the HR Officer said in

58   Tesla meeting prior to defamatory retaliation against  Appellant, George Jarvis

59   Austin "you shouldn't have to deal with that and take the rest of the day off with

60   pay [Paraphrased] (prior to retaliating days later)."    Mr. Austin, Pro Se, made

61   clear leading up to that conversation orally and in writing that there were unpaid

62   overtime wages, and other pay, and time-log discrepancies that needed correction

63   with management supervisors, HR Officers, etc.   Plaintiff worked so much

64   overtime whereas management team member inquired into why I was working so

65   hard, and so much, and attempted to put a limit on how much I worked.  A variety

66   of persons were provided fair notice including, but not limited to: Jerome Guillen

67   <jerome@tesla.com ; (who apparently took over for Bert Bruggeman), Freddy

68   Rivera <frivera@tesla.com ), multiple Supervisors, Deputy General Counsel Yusef

69    Mohamed  Ymohamed@tesla.com),  (whom Bert made intro to when saying I, Mr.

70    Austin, was too smart to work in that Department given skills, intelligence,

71    background and pedigree, etc.).  Mr. Austin also provided fair notice to Elon Musk

72    erm@tesla.com  (Elon Musk), and management at Tesla prior to HR meeting with

73    HR Officer Vince Woodard, vwoodard@tesla.com  from personal and my Tesla

74    company email geaustin@tesla.com.  All were informed prior to, and after,

75    retaliatory, defamatory, and negative employment action was made after Mr.

76    Austin's wage, health and safety, record-keeping and other complaints.

77         Mr. Austin's disclosures did not sit well with his supervisors and his

78    relationship with them became increasingly, and strangely, strained (as he was

79    attempting to avoid need for a lawsuit, or other legal action). Id. at 22.  In early

80    2020, Mr. Austin met with a Tesla human resource officer and a hiring manager to

81    discuss a promotion and to resolve his health, safety, and wage issues. Id. At the

82    end of the meeting, Mr. Austin was assured his health, safety, and wage concerns

83    would be resolved and was instructed by Tesla's HR Officer first to be treated

84    again in Telsa Clinic for on the job leg injuries, and then to take the rest of the day

85    off with pay. Id. at 23.  Mr. Austin is still suffering from that injury 600+ days

86   later, and still hasn't received Workers compensation.  See Austin v Atlina -

87   www.pacermonitor.com/public/case/36205191/Austin_v_Atlina_et_al )  Prior to

88   work related injury at Tesla Plaintiff could ride an outside mountain bike, play

89   basketball, and other activities, yet since injury to date has not been able to engage

90   due to leg pains and mobility limitations.

91           A series of Employer "missteps" occurred thereafter, the HR Meeting,

92   including a defamatory false statement that Mr. Austin recorded a supervisor in

93   violation of California law. Id.  Mr. Austin subsequently received a voicemail from

94   BSW personnel, representing joint-employers, according to Tesla HR Officer, that

95   his employment was being terminated because of his alleged violation of

96   California law (negative employment action). Id. at 23, 28, 99.  Joint employers

97   were not only well aware, and provided fair notice of the issues specifically, but

98   also well aware of these well known, widely reported on, and documented,

99   problematic patterns with their organizations prior to Mr. Austin making

100  complaints.  Telsa's ongoing issues with lack of response, or worse retaliation, to

101  legitimate concerns (i.e. labor code violations, health and safety code violations,

102   worker's compensation violations, wage theft, racism, retaliation, etc.) are being

103   covered widely from SEC reports, to news coverage See Addendum for full

104   discussion: [1] - [46].

105        As mentioned in the Tesla Coverage "N*gg*r" is an aged term designed to

106   demean, humiliate, strip away rights, and control …. Black people during a time of

107   mass enslavement, in many ways falsely labeling a Black man a "criminal" in

108   modern parlance, and in a time of mass incarceration is its equivalent and serves

109   the same nefarious purposes  (demean, humiliate, strip away rights, and control -

110   especially when acting on this assumption as employers did).  See Elizabeth

111   Hinton &amp; DeAnza Cook, The mass criminalization of Black Americans: A

112   historical overview, 4 Annual Review of Criminology 261–286 (2021).  See also

113   Louis Michael Seidman, Hyper-Incarceration and Strategies of Disruption: Is

114   There a WayOut?, 9 OHIO ST. J. CRIM. L. 109 (2011)  Because we live in live in

115   the first prison society according to Loic Wacquant (who Professor Seidman cites),

116   with largest population of prisoners on the planet, with an over representation of

117   Black men incarcerated, it hard to overestimate the negative repercussion of a false

118   criminal accusation in any environment (given the history of the country), but

119  especially in an employment context, when innocent of false accusation (where

120  Defamation per Se liability would be appropriate given the importance this area of

121  our lives is given in the law). See Peter Edelman's, Georgetown Law Professor,
122  Not a Crime to Be Poor: The Criminalization of Poverty in America See also

123  Elizabeth Hinton &amp; DeAnza Cook, The mass criminalization of Black

124  Americans: A historical overview, 4 Annual Review of Criminology 261–286

125  (2021).

126       It is hard enough for any employee to come forward and report labor, and

127  other issues (due to fear of retaliation), but even more challenging where an

128  organizational context where lack of response to major issues, or retaliation

129  appears the norm.  Prior to work injury, Mr. Austin was getting back into shape to

130  be able to start back up Plyometrics training and be able to dunk again (nothing too

131  extravagant just Mr. Austin's normal ability to 360, double pump, drop step, or or

132  single leg dunk off of either in a fast break context in recreational fun, when in

133  decent shape, and as a personal standard of health) would workout at local gyms

134  "City Sports Club" prior to, and after, 12+ hour days (not including commute and

135  donning and doffing protective wear) while getting straight A's in school (now 7

136    semesters, going on 8 of straight A's), preparing to score in top 1(one) percentile

137    worldwide in multiple standardized tests (as have done previously), and practicing

138    law in Federal Court, prior to obtaining Juris Doctor (JD), or taking the bar exam,

139    Pro Se, in Austin v. Georgetown, in appeals due to lower Court error(s) (as well as

140    others), (working a bunch of overtime to get out of temporary financial "tight"

141    economic position).  During Tesla's orientation, training, and safety protocols one

142    of the trainers said Tesla's standard is to make sure you leave at minimum, as you

143    came, physically, however, they did not meet their own standards, nor take

144    responsibility to correct the issues once made aware to them, and instead retaliated

145    (literally added insult to injury).

146

147         BECAUSE evaluating plausibility is a "context-specific task that requires

148    the reviewing court to draw on its judicial experience and common sense" (Iqbal,

149    556 U.S. at 679)…. it is important to understand and take into account the public

150    information, news, and reports shedding light to examine the context, properly

151    infer, deduce, utilize common sense, and judicial experience (*making Appellants*

152    *claims even more plausible toward probable*).  See Ashcroft v. Iqbal, 556 U.S.

153    662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

154                    **SUMMARY OF THE ARGUMENT**

155    I.    Appellant, as Pro Se Litigant, and Student, should have been granted leave

156          to Amend in the Interest of Justice, in light of the favorable facts for his

157          case, circumstances, disclosures, and liberal standard to amend in Interest of

158          Justice expressed in  *Robertson v. Dean Witter, Sharkey v. O'neal, and*

159          *Barnes v. Saul*.

160    Because, Mr. Austin's complaint could be saved by amendment, under *Robertson*

161    *v. Dean Witter,* as well as *Barnes v. Saul,* and because he is not required to show

162    that the claim is probable under *Iqbal,* the Liberal Construction Doctrine along

163    with in the Interest of Justice doctrine argue in favor of granting leave to amend

164    (especially since *Landers* standard is met of at least one week of unpaid overtime

165    pled). See Hirst v. Gertzen, 676 F.2d 1252, 1264-65 (9th Cir. 1982) Sharkey v.

166    O'Neal, 778 F.3d 767, 774 (9th Cir. 2015)

167     Any alleged deficiencies could be easily corrected by Mr. Austin.  Because

168     of the bias in favor of granting leave, less stringent standard for Pro Se litigants,

169     and liberal construction doctrine along with pled facts, as applied to precedent, that

170     are favorable to Plaintiff's success on the merits any deficiencies can be easily

171     corrected.  The necessary plead facts, disclosures, and elements taken in whole,

172     can properly be deduced, and inferred from Appellants pleading by the Court.

173     Because of the disclosed Audited independent findings of fact by the State of

174     California under the penalty of perjury with Defendant Employers, to buttress the

175     favorable plead facts meeting standards under *Landers (unpaid OT),* and

176     *Rosenfield* (anti-retaliation), along with multiple current events, and examples of

177     joint employers engaging in the very liability creating behavior at issue here, it is

178     reasonable for the Court to deduce and infer sufficiency of pleadings.  This is

179     especially true with *Twombly's* reminder that "a complaint needs only enough facts

180     to suggest that discovery may reveal evidence of illegality, even if the likelihood

181     of

182     finding such evidence is remote (inapposite to 'remote;' as the facts, and

183     disclosures suggest likely to succeed on the merits)." Twombly, 550 U.S. at 556.

184    II.    Appellant's, pro se, pleadings of Joint Employers *FLSA* violations,

185           regarding complained about unpaid overtime for multiple weeks, along

186           with independently verified findings of fact per General Order No. 71

187           disclosures, preliminary authenticating, and buttressing, said pleadings was

188           more than sufficient under this Circuit's *Landers* standard.

189    Because it was well plead that Plaintiff worked multiple over-time days, and weeks

190    (more than 40 hours), as the structure of that work at Tesla is literally everyday,

191    and nearly every week, work hours accumulate Overtime *(and Mr. Austin was not*

192    *paid at least one week of the multiple weeks of overtime, and made complaints to*

193    *correct that issue, repeatedly, leading up to HR meeting with HR Officer that*

194    *preceded retaliation days later)* pleading standards under *Landers,* and *Rosenfield*

195    were met.  Appellee/Defendant Employers, including publicly traded Tesla, are

196    jointly responsible for Appellant, pro se's, plead *FLSA* wage violations, given key

197    factors of control, scheduling, inspection, power to hire and fire, payroll, payment

198    and supervision under *Chao, Espinoza, and Scalia.*  All key factors are in favor of

199    joint-employer responsibility as one Hundred (100%) of the training, supervision,

200    management, safety protocols, on the job injury, control, scheduling, inspection,

17

201    and initial treatment in Tesla Clinic (while on augmented work schedule due to

202    ongoing leg injuries) and other controls (Badges, Electronic Scheduling Device,

203    Internal communication systems, etc.) were at, and with, Tesla in accord with

204    factors from *Chao, Espinoza,* and *Scalia* for joint-employer responsibility, and

205    liability.

206    III.    Appellant, Pro Se's, protected activity (complaints to supervisors, HR,

207            management, and company officers, etc.) regarding unpaid overtime,

208            Health and Safety, and other violations for multiple weeks leading to

209            adverse employment activity (wrongful termination based on defamatory

210            false accusation of criminal recording), apparently as pretext, only days

211            after meeting with HR Officer is sufficient under FLSA retaliation standard

212            (as articulated by this Circuit's *Rosenfield*, and the Supreme Court's

213            *Kasten*).

214            Because Mr. Austin made "the assertion of statutory rights" with sufficient

215    clarity, and detail "for a reasonable employer[s] to understand it," under *Rosenfield*

216    joint employers were provided fair notice, and are liaible for retaliation Defendant

217    Employers are jointly responsible for Retaliation and Civil Rights violations due to

218    employer retaliation because of FLSA violation, and other Health and Safety Code

219    complaints under joint employment doctrine, as well as extended, and shared,

220    liability articulated in *Arias*.

221
222                                    **STANDARD OF REVIEW**

223            For all issues set forth the standard of review is de novo.  See FRAP

224    28(a)(8)(B); See also Barnes v. Saul, No. 19-17203, at *2 (9th Cir. Dec. 30, 2020)

225    ("We review de novo an order of dismissal under Federal Rule of Civil Procedure

226    12(b)(6). Depot, Inc. v. Caring for Montanans, Inc., 915 F.3d 643, 652 (9th Cir.

227    2019). To state a plausible claim for relief, a plaintiff is not required to show that

228    the claim is probable. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).... "Determining

229    whether a complaint states a plausible claim for relief will . . . be a context-specific

230    task that requires the reviewing court to draw on its judicial experience and

231    common sense." Iqbal, 556 U.S. at 679. Documents filed pro se are to "to be

232    liberally construed ." Erickson v. Pardus, 551 U.S. 89, 94 (2007)

233

234

235

236

237

238

239

240

241
242                        **ARGUMENT**

**I.   Appellant, as Pro Se Litigant, and Student, should have been granted**

243

**leave to Amend in the Interest of Justice, in light of the favorable facts**

244

**for his case, circumstances, disclosures, and liberal standard to amend**

245

**in Interest of Justice expressed in  *Robertson v. Dean Witter, Sharkey v.***

246

***O'neal, and Barnes v. Saul*.**

247

*Broadly, a* dismissal under Fed.R.Civ.P. 12(b)(6) should not be affirmed

248

unless it is clear that the complaint could not be saved by any amendment.

249

Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 541 (9th Cir. 1984).

250

Under *Barnes* the Court "review[s] de novo an order of dismissal under Federal

251

Rule of Civil Procedure 12(b)(6). Depot, Inc. v. Caring for Montanans, Inc., 915

252

F.3d 643, 652 (9th Cir. 2019). To state a plausible claim for relief, a plaintiff is not

253

required to show that the claim is probable. Ashcroft v. Iqbal, 556 U.S. 662, 679

254

(2009). ... Determining whether a complaint states a plausible claim for relief will .

255

. . be a context-specific task that requires the reviewing court to draw on its judicial

256

257   experience and common sense." Iqbal, 556 U.S. at 679. Documents filed pro se are

258   to "to be liberally construed ." Erickson v. Pardus, 551 U.S. 89, 94 (2007)." Barnes

259   v. Saul, No. 19-17203, at *2 (9th Cir. Dec. 30, 2020)  Moreover the facts are taken

260   and understood favorably to the Plaintiff  See Hamilton v. Brown, 630 F.3d 889,

261   892-93 (9th Cir. 2011) ("when determining whether a complaint states a claim, a

262   court must accept as true all allegations of material fact and must construe those

263   facts in the light most favorable to the plaintiff." Id. "Additionally, in general,

264   courts must construe pro se pleadings liberally ." Id. (citing Balistreri v. Pacifica

265   Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)). ")

266        When unclear it should persuade the Court that it would be in the interests of

267   justice to remand the matter to give the opportunity to amend claims to comply

268   with the requirements of precedent (i.e. *Landers* standard of at least one week of

269   unpaid overtime). See Hirst v. Gertzen, 676 F.2d 1252, 1264-65 (9th Cir. 1982)

270   (plaintiff afforded opportunity to amend pleadings on remand).  This Principle is

271   highlighted in *Sharkey,* whereas  "dismissal with prejudice constitutes an abuse of

272   discretion where the district court fails to make a determination "that the pleading

273   could not possibly be cured by the allegation of other facts," Sharkey v. O'Neal,

274   778 F.3d 767, 774 (9th Cir. 2015) (quoting Lopez, 203 F.3d at 1127 (emphasis

275   added) (internal quotation marks omitted), and this is so " 'even if no request to

276   amend the pleading was made.' " Doe v. United States, 58 F.3d 494, 497 (9th

277    Cir.1995) (quoting Cook, Perkiss & Liehe v. N. Cal. Collection Service, 911 F.2d

278    242, 247 (9th Cir.1990).

279        **A. Any alleged deficiencies could be easily corrected by Mr. Austin.**

280        Because the plead facts are favorable to Plaintiff's success on the merits,

281    (i.e. worked overtime majority of weeks, and was not paid accordingly for several,

282    complained about this, and other discrepancies, orally and in writing prior till and in

283    meeting with HR Officer to correct issue before being retaliated against days later),

284    any alleged deficiency in pleading could be easily amended to conform to any

285    precedential standard (if not already met).  Under *Esntion Records* "The court should

286    freely give leave when justice so requires …. this rule evinces a bias in favor of

287    granting leave to amend" Esntion Records, Inc. v. Jonestm, Inc., Civil Action No.

288    07-CV-2027-L, at *2 (N.D. Tex. Apr. 2, 2009).  *Christensen* accurately asserts "The

289    Supreme Court has directed federal trial courts to read pro se papers liberally .

290    Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163

291    (1980) … [it is error to fail] to [adequately] take into account pro se status and thus

292    failed obligation "to make reasonable allowances to protect pro se litigants from

293    inadvertent forfeiture of important rights ... a pro se litigant "should be afforded ...

294    opportunity [to] fairly freely to amend his complaint."... [and should] not insist on

295    an unreasonable degree of formality in the pleadings" but instead ..."in terms

296    clearly understandable by laymen" …[to ensure] not defeated by "arcane legal

297   technicalities." Id. In Scherping v. Commissioner, 747 F.2d 478, 480 (8th Cir.

298   1984), [Further]... pro se pleadings are to be held to less stringent standards and are

299   to be liberally construed . Id. at 149. .... cases have extended the liberality doctrine

300   beyond the prisoner/civil rights context. The policy allowing liberal reading of pro

301   se pleadings is particularly appropriate in tax (and other complex) cases (like

302   employment). [whereas litigants], are likely to have difficulty understanding the

303   intricacies [of] litigation and procedure." Christensen v. C.I.R, 786 F.2d 1382,

304   1384-85 (9th Cir. 1986)

305          **B. The necessary plead facts, disclosures, and elements taken in**

306                  **whole, can properly be deduced, and inferred from Appellants**

307                  **pleading by the Court.**

308          As *Iqbal* and *Twombly* reminds evaluating a complaint's plausibility is a

309   "context-specific task that requires the reviewing court to draw on its judicial

310   experience and common sense." Iqbal, 556 U.S. at 679. ..., it need not contain

311   "detailed factual allegations," Twombly, 550 U.S. at 555; see also Erickson v.

312   Pardus, 551 U.S. 89, 93 (2007) ("[S]pecific facts are not necessary . . . ."). Rather,

313   a complaint needs only enough facts to suggest that discovery may reveal evidence

314   of illegality, even if the likelihood of finding such evidence is remote. Twombly,

315    550 U.S. at 556.  Because of the disclosed Audited independent findings of fact by

316    the State of California under the penalty of perjury with Defendant Employers, to

317    buttress the plead facts meeting standards under *Landers (unpaid OT),* and

318    *Rosenfield* (anti-retaliation), along with multiple current events, and examples of

319    this specific, and similarly situated companies covered in the news, and other

320    pubic forums, specifically engaging in the very liability creating behavior at issue

321    here, it is reasonable for the Court to deduce and infer sufficiency of pleadings.

322    This is especially true under *Washington*  as even "inartful pleading" by pro se

323    litigants are instructed by the Supreme Court to be be construed liberally.  See

324    Washington

325    v. Garrett, 10 F.3d 1421, 1432 n.14 (9th Cir. 1993) Eldridge v. Block, 832 F.2d

326    1132, 1137 (9th Cir. 1987) (quoting Boag v. MacDougall, 454 U.S. 364, 365, 102

327    S.Ct. 700, 701, 70 L.Ed.2d 551 (1982)).")

328            Under *Ballaris* this doctrine of liberality allows for proper inference, and

329    deduction as to sufficiency  (given the pleadings, context, and disclosure) Ballaris

330  v. Wacker Siltronic Corp., 370 F.3d 901, 908 (9th Cir. 2004) (""Once a federal

331  claim is properly presented, a party can make any argument in support of that

332  claim; parties are not limited to the precise argument they made..." Yee v.

333  Escondido, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153

334  (1992)."...."Where, as here, the question presented is one of law, we consider it in

335  light of "all relevant authority," regardless of whether such authority was properly

336  presented in the district court. Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct.

337  1019, 127 L.Ed.2d 344 (1994).")   As *Gordon* articulates when ""denial [to amend,

338  or alternatively unjustified dismissal] rests on an inaccurate view of law, and is

339  therefore an abuse of discretion," [a] de novo review of the underlying legal

340  determination [is required]. Id. All allegations of material fact made in the

341  complaint are taken as true and construed in the light most favorable to the

342  plaintiff. See Smith v. Jackson, 84 F.3d 1213, 1217 (9th Cir. 1996).") See Gordon

343  v. City of Oakland, 627 F.3d 1092, 1094-95 (9th Cir. 2010)

344      As did Appellants pleadings, which can be properly inferred and deduced,

345  they "must comply with the FLSA's... wage requirements. ... employees cannot

346  waive the protections of the FLSA , Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697,

347   707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), nor may labor organizations negotiate

348   provisions that waive employees' statutory rights under the FLSA . Barrentine v.

349   Arkansas-Best Freight Sys., 450 U.S. 728, 740-41,101 S.Ct. 1437, 67 L.Ed.2d 641

350   (1981).")..."The United States Department of Labor has adopted regulations

351   outlining employers' FLSA obligations. [including]  29 C.F.R. § 531.35, which

352   provides in pertinent part: Whether in cash or other facilities, `wages ' cannot be

353   considered to have been paid by the employer and received by the employee unless

354   they are paid finally and unconditionally or `free and clear.'")"  See Gordon v. City

355   of Oakland, 627 F.3d 1092, 1095 (9th Cir. 2010)   Here Plaintiff/Appellant alleged

356   more than the minimum pleading standard under *Landers (i.e.* that he was not

357   properly paid "free and clear" overtime of at least one week, in fact from multiple

358   weeks, made overtime wage complaints, and was subsequently retaliated against).

359   This should have met the pleading standard, or at minimum been granted leave to

360   amend in the interest of justice (as the facts, and disclosures from independent

361   finders of fact (i.e. State of California Auditors), provide enough to infer that not

362   only are any alleged deficiencies fixable, but are likely to succeed on the merits).

363    **II.    Appellant's, pro se, pleadings of Joint Employers *FLSA* violations,**

364            **regarding complained about unpaid overtime for multiple weeks, along**

365            **with independently verified findings of fact per General Order No. 71**

366            **disclosures, preliminary authenticating, and buttressing, said pleadings**

367            **was more than sufficient under this Circuit's *Landers* standard.**

368            Under Landers " at a minimum the plaintiff must allege at least one

369    workweek when he worked in excess of forty hours and was not paid for the excess

370    hours in that workweek, or was not paid minimum wages." Landers v. Quality
371    Commc'ns, Inc., 771 F.3d 638, 646 (9th Cir. 2014).  Under *Williamson* the Court

372    "review[s] a dismissal for failure to state a claim pursuant to Federal Rule of Civil

373    Procedure 12(b)(6) de novo. See TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir.

374    1999). A complaint should not be dismissed unless it appears beyond doubt that

375    the plaintiff can prove no set of facts in support of the claim that would entitle it to

376    relief. See Morley v. Walker, 175 F.3d 756, 759 (9th Cir. 1999)." See Williamson

377    v. General Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir. 2000)  *Landers*

378    continues that the Court must"accept as true all well pleaded facts in the complaint

379    and construe them in the light most favorable to the nonmoving party." Zadrozny

380 v. Bank of N.Y. Mellon, 720 F.3d 1163, 1167 (9th Cir.2013)....After all, most (if

381 not all) of the detailed information concerning a plaintiff-employee's compensation

382 and schedule is in the control of the defendants. See Pruell, 678 F.3d at 15 ; see

383 also 29 U.S.C. § 211(c) (FLSA provision requiring employers subject to the FLSA

384 to keep records concerning their employees' work schedules and compensation).")"

385 See Landers v. Quality Commc'ns, Inc., 771 F.3d 638, 640 (9th Cir. 2014)

386   Here, it was well plead that Plaintiff worked multiple over-time days, and

387 weeks (more than 40 hours), as the structure of that work at Tesla is literally

388 everyday, and nearly every week, work hours accumulate Overtime (and Mr.

389 Austin was not paid at least one week of the multiple weeks of overtime, and made

390 complaints to correct that issue, repeatedly, leading up to HR meeting with HR

391 Officer that preceded retaliation days later).  Plaintiff worked, above and beyond,

392 additional days nearly every week to the point a supervisor/manager even inquired

393 as to why I was working so hard, and attempted to put a cap on how much

394 overtime I could work. According to State of California Auditing and Accounting

395 Department Plaintiff was not only underpaid (at minimum approx 25K), but

396   verified those findings of fact, disclosed to the Court, under penalty of perjury by

397   Defendant Employers.

398        It is apparent, utilizing context, and common sense, as partially informed by

399   reports on current events, that labor code (and other) violations by Tesla, and joint

400   employers, are not novel, and are plausible with plead facts. Similar to the unpaid

401   overtime wages in *Chao*, in violation of the Fair Labor Standards Act (FLSA) , 29

402   U.S.C. § 207(a)(1). [Defendants], as it turns out, was not new to overtime wage

403   violations.  Chao v. A-One Med. Servs., Inc., 346 F.3d 908, 913-14 (9th Cir. 2003)

404   "One of the principal purposes of the FLSA is to ensure that employees are
405   provided appropriate compensation for all hours worked. See, e.g., 29 C.F.R. §

406   778.223 ("Under the Act an employee must be compensated for all hours

407   worked."); 29 C.F.R. § 778.315 ..."The Supreme Court has held that in enacting

408   the FLSA Congress intended "to guarantee either regular or overtime

409   compensation for all actual work or employment. To hold that an employer may

410   validly compensate his employees for only a fraction of time consumed in actual

411   labor would be inconsistent with the very purpose and structure" of the Act.

412   Tennessee Coal, Iron R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597-98, 64

413    S.Ct. 698, 88 L.Ed. 949 (1944); see also 29 C.F.R. § 778.223" See Ballaris v.

414    Wacker Siltronic Corp., 370 F.3d 901, 913 (9th Cir. 2004)

415         Defendant/Appellee joint employers are covered, and thus liable under

416    FLSA as outlined in *Chao*.  *See* Chao v. A-One Med. Servs., Inc., 346 F.3d 908,

417    914 (9th Cir. 2003) ("In order to be covered by the FLSA's overtime rules,

418    employees must be "engaged in commerce or in the production of goods for

419    commerce [i.e. Tesla products], or . . . employed in an enterprise engaged in

420    commerce." 29 U.S.C. § 207(a)(1). In other words, coverage exists if either the

421    employee is engaged in commerce (individual coverage), 29 U.S.C. § 203(b)

422    (defining "commerce" as "trade, commerce, transportation, transmission, or

423    communication among the several States or between any State and any place

424    outside thereof"), or the employer is an enterprise engaged in commerce

425    (enterprise coverage), 29 U.S.C. § 203(s) (defining "enterprise engaged in

426    commerce" as enterprises that, inter alia, have annual gross revenue of $500,000 or

427    greater). See

428    Zorich v. Long Beach Fire Dep't Ambulance Serv., Inc., 118 F.3d 682, 686 (9th

429    Cir. 1997)")

430       **A. Appellee/Defendant Employers, including publicly traded Tesla,**

431          **are jointly responsible for Appellant, pro se's, plead _FLSA_ wage**

432          **violations, given key factors of control, scheduling, inspection,**

433          **power to hire and fire, payroll, payment and supervision under**

434          **_Chao, Espinoza, and Scalia_.**

435       All key factors are in favor of joint-employer responsibility as Plaintiff's

436   wage payments came through all organizational entities Personnel Staffing Group,

437   and Balance Staffing, and originated from Tesla (as noted on the check stubs

438   disclosed per _General Order 71 See Docket #20, #68_, for work at Tesla).  One

439   Hundred (100%) of the training, supervision, management, safety protocols, on the
440   job injury, control, scheduling, inspection, and initial treatment in Tesla Clinic

441   (while on augmented work schedule due to ongoing leg injuries) and other controls

442   (Badges, Electronic Scheduling Device, Internal communication systems, etc.)

443   were at, and with, Tesla.  Accordingly, in the Ninth Circuit, "the concept of joint

444   employment should be defined expansively under the FLSA." Chao v. A-One

445   Med.

446    Servs., Inc., 346 F.3d 908, 917 (9th Cir. 2003) (quoting Torres-Lopez v. May, 111

447    F.3d 633, 639 (9th Cir. 1997)). An employee may work for two employers

448    simultaneously.)

449         "In Torres-Lopez v. May, 111 F.3d 633 (9th Cir. 1997), the Ninth Circuit

450    determined that the grower exercised significant control over the farmworkers'

451    working conditions because the grower: (1) controlled the overall harvest schedule;

452    (2) controlled the number of workers needed for harvesting; (3) advised the labor

453    contractor about when to begin the harvest; (4) had the power to decide which days

454    were suitable for harvesting, e.g., grower called off the harvest one day due to a

455    shortage of bins; (5) had the right to inspect all of the work performed by the

456    farmworkers; and (6) was present in the fields on a daily basis. Id. at 642."

457    Arredondo v. Delano Farms Co., No. 1:09-cv-01247-LJO-DLB, at *13 (E.D. Cal.

458    Apr. 11, 2012)  According to *Espinoza* "The five formal or regulatory "factors"

459    are: "(A) The nature and degree of control of the workers; (B) The degree of

460    supervision, direct or indirect, of the work; (C) The power to determine the pay

461    rates or the methods of payment of the workers; (D) The right, directly or

462    indirectly, to hire, fire, or modify the employment conditions of the workers; [and]

463    (E) Preparation of payroll and the payment of wages."  Espinoza v. MH Janitorial

464    Servs., No. 76752-6-I, at *8-9 (Wash. Ct. App. Nov. 4, 2019)  See also Trustees of

465    the Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc., 572

466    F.3d 771, 776 n.4 (9th Cir. 2009) (the "joint employer " theory is recognized under

467    the FLSA . See Torres-Lopez v. May, 111 F.3d 633, 638 (9th Cir. 1997). ... the

468    FLSA imposes independent obligations on employers . See Leddy v. Standard

469    Drywall, Inc., 875 F.2d 383, 387 (2d Cir. 1989) (stating that the "FLSA commands

470    employers to pay specified wages)

471            Under *Scalia,* the Three Musketeers' motto, by Alexandre Dumas, 'all for

472    one, and one for all', is apt as "all joint employers are responsible, both

473    individually and jointly, for compliance with all of the applicable provisions of the

474    act." A newer, not-yet-effective version of this regulation refers expressly to joint

475    and several liability: "[A] joint employer is jointly and severally liable with ... any

476    other joint employers for compliance with all of the applicable provisions of the

477    Act (stating that the FLSA "was designed to regulate the conduct of employers for

478    the benefit of employees")." Scalia v. Emp'r Sols. Staffing Grp., 951 F.3d 1097,

479    1103 (9th Cir. 2020)

480            Under *Chao's* factors the specific calculus might be slightly different, but

481    the underlying result would equate the same: joint liability (as Tesla Motors, BSW,

482    and PSG share common business purpose, common control, related activities, etc.

483    regarding work that forms basis of this action) See Chao v. A-One Med. Servs.,

484   Inc., 346 F.3d 908, 915 (9th Cir. 2003) ("Enterprise' means the related activities

485   performed (either through unified operation or common control) by any person or

486   persons for a common business purpose." 29 U.S.C. § 203(r)(1). If these three

487   elements — related activities, unified operation or common control and common

488   business purpose — are present, different organizational units are grouped together

489   for the purpose of determining FLSA coverage. Id.; Brennan v. Arnheim Neely,

490   Inc., 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973)....Common' control

491   . . . exists where the performance of the described activities [is] controlled by one

492   person or by a number of persons, corporations, or other organizational units

493   acting together." 29 C.F.R. § 779.221.

494       "`[C]ontrol' . . . includes the power to direct, restrict, regulate, govern, or

495   administer the performance of the activities."...We must look beyond formalistic

496   corporate separation to the actual or pragmatic operation and control, whether

497   unified or, instead, separate as to each unit." Donovan v. Grim Hotel Co., 747 F.2d

498   966, 970 (5th Cir. 1984)...the facts establish that the employee is employed jointly

499   by two or more employers, i.e., that employment by one employer is not

500   completely disassociated from employment by the other employer(s), all of the

501   employee's work for all of the joint employers during the workweek is considered

502   as one employment for purposes of the Act. In this event, all joint employers are

503   responsible, both individually and jointly, for compliance with all of the applicable

504   provisions of the act, including the overtime provisions, with respect to the entire

505   employment for the particular workweek. 29 C.F.R. § 791.2(a) (footnotes omitted).

506   See, e.g., Karr v. Strong Detective Agency, Inc., 787 F.2d 1205, 1208 (7th Cir.

507   1986) (aggregating hours from joint employers for the purpose of determining

508   overtime) ; Wirtz v. Hebert, 368 F.2d 139, 141-42 (5th Cir. 1966) (same); cf.

509   Moon v. Kwon, 248 F.Supp.2d 201, 236-38 (S.D.N.Y. 2002) (applying § 791.2(a)

510   to find joint and several liability for overtime wages from joint employers). "[T]he

511   concept of joint employment should be defined expansively under the FLSA ."

512   Torres-Lopez v. May, 111 F.3d 633, 639 (9th Cir. 1997).")  These factors all argue

513   for Joint responsibility, and legal liability of Joint Defendant/Appellee employers.

514

515   **III.   Appellant, Pro Se's, protected activity (complaints to supervisors, HR,**

516   **management, and company officers, etc.) regarding unpaid overtime,**

517   **Health and Safety, and other violations for multiple weeks leading to**

518   **adverse employment activity (wrongful termination based on**

519   **defamatory false accusation of criminal recording), apparently as**

520   **pretext, only days after meeting with HR Officer is sufficient under**

521        **FLSA retaliation standard (as articulated by this Circuit's *Rosenfield*,**

522        **and the Supreme Court's *Kasten*).**

523        Jointly responsible Employers added insult to literal injury via their

524   retaliation as plaintiff had a. suffered on the job injury, b. was continually being

525   treated in Tesla Clinic, and c. had required augmented work duties/schedule due to

526   injury while making complaints including the meeting with HR Officer (for which

527   Plaintiff was fraudulently induced into going on the basis of promotion and

528   ensuring payment of unpaid overtime), yet completely opposite was retaliated

529   against, is still injured  (and to date has never received Workers compensation,

530   after over 600 days from injury).

531        Under *Rosenfield* "it is the assertion of statutory rights (i.e. the advocacy of

532   rights) by taking some action adverse to the company—whether via formal

533   complaint, providing testimony in an FLSA proceeding, complaining to superiors

534   about inadequate pay, or otherwise—that is the hallmark of protected activity

535   under § 215(a)(3)." Rosenfield v. Globaltranz Enters., Inc., 811 F.3d 282, 289 (9th

536   Cir. 2015)  Under *Kasten* "the Supreme Court established a "fair notice" test for

537   deciding whether an employee has "filed any complaint" under the anti-retaliation

538    provision of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §

539    215(a)(3): "[A] complaint must be sufficiently clear and detailed for a reasonable

540    employer to understand it, in light of both content and context, as an assertion of

541    rights protected by the statute and a call for their protection." Rosenfield v.

542    Globaltranz Enters., Inc., 811 F.3d 282, 289 (9th Cir. 2015) (quoting Kasten v.

543    Saint–Gobain Performance Plastics Corp., 563 U.S. 1, 131 S.Ct. 1325, 1335, 179

544    L.Ed.2d 379 (2011))  The standards were clearly surpassed in Appellant's

545    pleadings, and disclosures.

546          "Fair notice" to liable joint employer's was provided and response from

547    their representatives confirms they understood the level of seriousness of

548    complaints.

549    One said as mentioned "you are barking up the wrong tree," the HR Officer said in

550    Tesla meeting prior to retaliation against  Appellant, George Jarvis Austin "you

551    shouldn't have to deal with that and take the rest of the day of paid [Paraphrased]

552    (prior to retaliating two days or so later)."

553          Plaintiff/Appellant, Pro Se, made clear leading up to that conversation orally

554    and in writing that there were unpaid overtime wages, and other pay, and time-log

555   discrepancies that needed correction with management supervisors, HR Officers,

556   etc.  Plaintiff worked so much overtime whereas management team member

557   inquired into why I was working so hard, and so much, and attempted to put a

558   cap/limit on how much I worked.  A variety of persons were provided fair notice

559   including, but not limited to: Jerome Guillen <jerome@tesla.com ; (who

560   apparently took over for Bert Bruggeman), Freddy Rivera <frivera@tesla.com ),

561   multiple Supervisors, Deputy General Counsel Yusef Mohamed

562   Ymohamed@tesla.com),  who Bert made intro to when saying I, Appellant, was

563   too smart to work in that Department given skills, intelligence, background and

564   pedigree, etc.), Elon Musk erm@tesla.com  (Elon Musk), and management at

565   Tesla prior to HR meeting with Vince Woodard, HR Officer,

566   vwoodard@tesla.com  from personal and my Tesla company email

567   geaustin@tesla.com.  All were informed prior to, and after, retaliatory, defamatory,

568   and negative employment action was made after Plaintiff/Appellant wage, health

569   and safety, record-keeping and other complaints.

570          Mr. Austin, Pro Se, also made clear Health and Safety Code violations,

571   while being injured on the job, still being treated in Tesla Clinic for those leg

572    injuries.  Plaintiff is still suffering from that injury 600+ days later, and still hasn't

573    received Workers compensation.  See Austin v Atlina, et. al.  Prior to work related

574    injury at Tesla Plaintiff could ride an outside mountain bike, play basketball, and

575    other activities, yet since injury to date has not been able to engage due to leg pains

576    and mobility limitations.  From initial complaint the State of California, Auditing

577    and Accounting, Department has since proven the veracity of his wage complaints

578    and even confirmed a minimum amount of unpaid wages, and the specific account

579    number from Defendant/Appellee Employers, when Investigating the wage

580    documents with liable joint employers under the penalty of perjury (submitted to

581    them by George Jarvis Austin prior to paying him maximum weekly benefits based

582    on audited wages due to back injury from an non-work car accident).

583        As articulated in *Chao,* the initial violations, compounded by the reckless

584    disregard, and malicious retaliation was willful.  Chao v. A-One Med. Servs., Inc.,

585    346 F.3d 908, 918 (9th Cir. 2003) ("A violation of the FLSA is willful if the

586    employer "knew or showed reckless disregard for the matter of whether its conduct

587    was prohibited by the [FLSA ]." McLaughlin v. Richland Shoe Co., 486 U.S. 128,

588    133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); SEIU, Local 02 v. County of San

589    Diego, 60 F.3d 1346, 1356 (9th Cir. 1994) (quoting Richland Shoe)") "See Alvarez

590    v. IBP, Inc., 339 F.3d 894, 2003 WL 21788995 (9th Cir. Aug. 5, 2003), 2003

591    U.S.App. LEXIS 15622, at *36 (noting that willfulness exists "where an employer

592    disregarded the very possibility that it was violating the [FLSA ]"")  Chao v. AOne

593    Med. Servs., Inc., 346 F.3d 908, 919 n.7 (9th Cir. 2003) ("even viewed in the

594    light most favorable …. appear to have been steps made to evade the FLSA , not to

595    comply with it. See Alvarez, 339 F.3d 894, 2003 WL 21788995, 2003 U.S.App.

596    LEXIS 15622, at *37 ("was on notice of its FLSA requirements, yet took no

597    affirmative action to assure compliance with them. To the contrary, ... actions may

598    more properly be characterized as attempts to evade compliance. . . .")")

599        Courts look to federal law when analyzing retaliation claims, and utilizing

600    the three-part burden shifting test described in McDonnell Douglas Corp. v. Green,

601    411 U.S. 792 (1973)). To establish a prima facie case of retaliation, a plaintiff must

602    demonstrate that  (1) [t]he[y] engaged in statutorily protected activity, (I.e. oral and

603    written complaints to all joint employers "up the chain" to supervisors,

604    management, officers, etc) (2) defendants took some adverse employment action

605    against [them], (i.e. Defendants retaliated within days via wrongful termination,

606    unsupported, nor investigated defamation, and a complete 'about face' regarding

607    the purpose of the meeting (for promotion), and instructed to get treated by Tesla

608    Clinic further confirming extent of physical injury, and prescribing next steps

609    including MRI, and other tests,) and (3) there is a causal connection between the

610    protected activity and the discharge. (Causal link in connection as explicit purpose

611    of meeting outside of promotion was to correct companies errors of unpaid wages

612    (and other violations), whereas plaintiff complained for weeks leading up to

613    meeting without correction (in oral and written form), and whereas after the

614    meeting plaintiff again was assured the meeting was only to fix their labor code,

615    and other violations (I.e. unpaid overtime, etc.), they instead made a complete

616    about face, and took negative employment action within days.)  See Stegall v.

617    Citadel Broad. Co., 350 F.3d 1061, 1065-1066 (9th Cir. 2003)

618     "An employee need not file a formal or detailed complaint to enjoy the protection

619            of Section 215(a). Lambert v. Ackerley, 180 F.3d 997, 1007-08 (9th Cir.

620    1999). Rather, "[to] fall within the scope of the anti-retaliation provision, a

621    complaint must be sufficiently clear and detailed for a reasonable employer to

622    understand it, in light of both content and context, as an assertion of rights

623    protected by the statute and a call for their protection." Kasten v. Saint-Gobain

624    Performance Plastics Corp., 563 U.S. 1, 14 (2011). The threshold issue, which

625    must be determined on a case- by-case basis, is whether the described activity

626    placed the employer on "fair notice that an employee is making a complaint that

627    could subject the employer to a later claim of retaliation." Rosenfield v.

628    GlobalTranz Enterprises, Inc., 811 F.3d 282, 286 (9th Cir. 2015). "[I]t is clear that

629    so long as an employee communicates the substance of his allegations to the

630    employer (e.g., that the employer has failed to pay adequate overtime), he is

631    protected by § 215(a)(3)." Lambert, 180 F.3d at 1008 " See Allison v. Dolich, Case

632    No.: 3:14-CV-1005-AC, at *15-16 (D. Or. Feb. 12, 2018)

633            Under *Miller* "the purpose of the FLSA's anti-retaliation clause is to ensure

634    vindication of the wage-and-hour rights established by the statute. See, e.g.,

635    Lambert, 180 F.3d at 1004 ("The FLSA's anti-retaliation clause is designed to

636    ensure that employees are not compelled to risk their jobs in order to assert their

637    wage and hour rights under the Act."); Onken v. W.L. May Co., 300 F. Supp. 2d

638    1066, 1068 (D. Or. 2004) ("The statute's anti-retaliation provision, therefore, is

639    designed to encourage employees to report alleged violations of FLSA's

640    substantive provisions without fear of reprisal)... [as articulated in] All the cases

641    relied upon by Plaintiff involved alleged violations of the FLSA's substantive

642    provisions in addition to alleged violations of the anti-retaliation provision. See

643    Lambert v. Ackerley, 180 F.3d 997, 1004 (9th Cir. 1999) (violations of overtime

644    wage provisions); Henderson v. City of Grantville, Ga., 37 F. Supp. 3d 1278, 1281

645    (N.D. Ga. 2014) (unpaid wages for hours worked during unauthorized shift with

646    police department); E.E.O.C. v. White & Son Enterprises, 881 F.2d 1006, 1008

647    (11th Cir. 1989) (violation of FLSA's prohibition of sex discrimination);

648    Rosenfield v. GlobalTranz Enterprises, Inc., 811 F.3d 282, 288 (9th Cir. 2015)

649    (misclassification of employees in violation of FLSA); Darveau v. Detecon, Inc.,

650    515 F.3d 334, 336 (4th Cir. 2008) (violation of FLSA overtime provisions); Pineda

651    v. JTCH Apartments, L.L.C., 843 F.3d 1062, 1063 (5th Cir. 2016) (unpaid

652    overtime in violation of FLSA)"  See Miller v. Infinite Percent Partners , No. 20cv-

653    02253-HSG, at *4 (N.D. Cal. Feb. 3, 2021) In Rosenfield v. Globaltranz

654    Enters., Inc., 811 F.3d 282, 287 (9th Cir. 2015) ("Kasten's")  "the Court of Appeals

655    determined that a jury could reasonably find that Rosenfield's complaints constituted

656    a protected activity under section 215(a)(3) as FLSA compliance was not part of

657    Rosenfield's job duties; thus, her advocacy for the rights of employees to be paid in

658    accordance with the FLSA qualified as "any complaint" under FLSA"

659    Analogously Appellant, Pro Se's, written an oral complaints to supervisors,

660    managers, HR, Officers, etc. of all Defendant Joint Employers regarding unpaid

661    overtime, would qualify, and surpass that standard.

662         Even the dissent in *Rosenfield* would agree with Appellant's position.

663    Under Dissents' more stringent standard Appellants actions (*under the Fair Labor*

664    *Standards Act' anti-retaliation provision 'protected conduct*) would still constitute

665    "filed any complaint" … [which] contemplates some degree of formality ... [.]" Id.

666    at 1334. The Court repeatedly referenced "oral grievances," id. at 1333, in

667    connection with "workplace grievance procedures," id. at 1334, and emphasized

668    that including oral complaints in the definition of "any complaint" allows for the

669    use of "hotlines, interviews, and other oral methods of receiving complaints," id. at

670    1334, as well as other "desirable informal workplace grievance procedures." Id.

671    The examples of oral complaints provided by the Supreme Court in Kasten

672    contemplate a degree of formality [that is actually found in Appellant's complaints,

673    that the dissent argued lacked in *Rosenfield*]" See Rosenfield v. Globaltranz

674    Enters., Inc., 811 F.3d 282, 290 (9th Cir. 2015)

675 **A.  Defendant Employers are jointly responsible for Retaliation and**

676 **Civil Rights violations due to employer retaliation because of**

677 **FLSA violation, and other Health and Safety Code complaints**

678 **under joint employment doctrine, as well as extended, and shared,**

679 **liability articulated in Arias.**

680 Analogous to the joint liability created for wage violations under FLSA, the

681 same, and more, contribute to extensive liability for retaliation by joint employers

682 under FLSA.  All key factors are in favor of joint-employer responsibility as

683 Plaintiff's wage payments came through all organizational entities Personnel

684 Staffing Group, and Balance Staffing, and originated from Tesla (as noted on the

685 check stubs disclosed per General Order 71 See Docket #20, #68 (Verified

686 Plaintiff's wages, and wage statements for Q3 and Q4 Plaintiff wages for Q3 & Q4,

687 with wages in Q4 totaling above the maximum benefit threshold of $28,145.01 (for

688 months October through December) triggering Plaintiffs maximum benefit amount

689 of $1,300 weekly; investigated and confirmed by Defendant Employers via State

690 of California Auditing and Accounting Department, Investigators under penalty of

691 perjury), for work at Tesla.  One Hundred (100%) of the training, supervision,

692   management, safety protocols, on the job injury, control, scheduling, inspection,

693   and initial treatment in Tesla Clinic (while on augmented work schedule due to

694   ongoing leg injuries) and other controls (Badges, Electronic Scheduling Device,

695   Internal communication systems, etc.) were at, and with, Tesla.  Accordingly, in

696   the Ninth Circuit, "the concept of joint employment should be defined expansively

697   under the FLSA." Chao v. A-One Med. Servs., Inc., 346 F.3d 908, 917 (9th Cir.

698   2003) (quoting Torres-Lopez v. May, 111 F.3d 633, 639 (9th Cir. 1997)). An

699   employee may work for two employers simultaneously.)

700        The liability for retaliatory acts is more expansive and does not stop, at the

701   moment of negative employment action (even wrongful termination) under

702   *Darveau.  See* Darveau v. Detecon, Inc., 515 F.3d 334, 342 (4th Cir. 2008) ("The

703   similar statutory language suggests that the Supreme Court's interpretation of

704   "employee" in Robinson—to include former as well as current employees—and

705   definition of retaliatory acts in Burlington Northern similarly apply in the FLSA

706   context.") (cited by Arias v. Raimondo, 860 F.3d 1185, 1190 (9th Cir. 2017)).

707   Given the similar statutory language between Title VII and the FLSA, there is no

708   reason to believe the same principles would not apply in the FLSA context.  -

709    Heier v. Czika CASE NO. 5:19-cv-1955 (N.D. Ohio Aug. 18, 2020)

710    Antiretaliation claims ... are not limited to employers but, instead, extend to "any

711    person acting directly or indirectly in the interest of the employer." See Arias v.

712    Raimondo, 860 F.3d 1185 (9th Cir. 2017) ("Congress clearly means to extend ...

713    reach beyond actual employers.")  Berglund v. Canyon Cnty Case No. 1:19-cv-

714    00396-CWD (D. Idaho Mar. 4, 2020)

715    "[T]he plain language of the statute belies that focus. § 215(a)(3), the FLSA

716    retaliation provision, states that "it shall be unlawful for any person . . . to

717    discharge or in any other manner discriminate [or retaliate] against any employee

718    because such employee has filed any complaint[.]" See also Arias v. Raimondo,

719    860 F.3d 1185 (9th Cir. 2017) ("Congress clearly means to extend section

720    215(a)(3)'s reach beyond actual employers") - Braxton v. Jackson Civil Action No.

721    DKC 18-1946 (D. Md. Sep. 20, 2019)  The Ninth Circuit has held that "[t]he

722    definition of 'employer' under the FLSA is not limited by the common law concept

723    of 'employer,' and is to be given an expansive interpretation in order to effectuate

724    the FLSA's broad remedial purposes." Bonnette v. Cal. Health & Welfare Agency,

725    704 F.2d 1465, 1469 (9th Cir. 1983); see also Arias v. Raimondo, 860 F.3d 1185,

726    1191-92 (9th Cir. 2017) (finding the term "employer" for purposes of FLSA's

727    antiretaliation provision "extend[s] . . . [the statute's] reach beyond actual

728    employers" and can include individuals acting indirectly and on behalf of wage-

729    paying employers). Thus, "Congress clearly means to extend section 215(a)(3)'s

730    reach beyond actual employers." Estacion v. Kaumana Drive Partners Civ. No. 19-

731    cv-

732    00255 JMS-KJM (D. Haw. Oct. 18, 2019).

733

734

735

736

737

738

739
740                              **CONCLUSION**

741    For the foregoing reasons, the judgment of the district court should be reversed,

742    with leave to amend, and the case remanded to District Court for further

743    proceedings.  See *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1147

744    (9th Cir. 2000)

745
746

747    Date: 8/13/21

748                                      George Jarvis (or J.) Austin

749                                    */s/ George Jarvis (or J.) Austin*
750
751                                    Plaintiff-*Appellant, Pro Se*
752
753
754
755

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 21-15151

The undersigned attorney or self-represented party states the following:

(•) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/George Jarvis Austin    **Date** | 8/13/21

*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  21-15151

I am the attorney or self-represented party.

**This brief contains**  10803  **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/George Jarvis Austin          **Date**  08/13/21

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 21-15151 |

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Appellant, Pro Se, George Jarvis Austin's, Opening Brief

**Signature** | s/George Jarvis Austin |   **Date** | 08/13/21 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 15**                                                                                   *Rev. 12/01/2018*

# ADDENDUM

## Statutes

*28 U.S.C. § 1291*                    ix
*28 U.S.C. § 1331*                    ix
*29 U.S.C. Ch. 8 Fair Labor Standards Act (FLSA)* ,        (passim)

## Rules

*FRAP 26.1*                    i
*FRAP 26.1(a)*.                    i
*FRAP 28(a)(8)(B)*;          i
*FRCP 12(b)(6)*.                    12, 13
*General Order No. 71*          (passim)
*Ninth Cir. R. 28-2.8.*          1

## Other Authorities

*Elizabeth Hinton &amp; DeAnza Cook, The mass criminalization of Black Americans: A historical overview, 4 Annual Review of Criminology 261–286 (2021).*

*Louis Michael Seidman, Hyper-Incarceration and Strategies of Disruption: Is There a WayOut?, 9 OHIO ST. J. CRIM. L. 109 (2011)*

*Peter Edelman's, Georgetown Law Professor, Not a Crime to Be Poor: The Criminalization of Poverty in America*

*Elizabeth Hinton &amp; DeAnza Cook, The mass criminalization of Black Americans: A historical overview, 4 Annual Review of Criminology 261–286 (2021).*

**Other Informational Sources, Reports, News**

[1] https://www.civilrightsca.com/protocol-tesla-discrimination-lawsuits/
- (Ex-workers Say Tesla is Still Racist, ...100-plus sworn statements from a class-action lawsuit and public records obtained by Protocol.)

[2]-https://www.google.com/amp/s/www.theverge.com/platform/amp/2021/8/5/22611725/tesla-paid-1-million-black-former-employee-racist-slur
- (Tesla reportedly paid $1 million to former employee who said supervisors called him a racist slur; Melvin Berry said the company failed to act when supervisors called him the N-word then retaliated - Berry is not the first worker to allege racism at Tesla's Fremont plant)

[3]-https://www.latimes.com/business/autos/la-fi-hy-tesla-racism-lawsuit-20171115-story.html
- (Marcus Vaughn ... alleges that supervisors and co-workers called him the N-word, but his written complaint to human resources about it was not investigated….standard operating procedure at the Tesla factory is pre-civil rights era race discrimination," the lawsuit says. "Race harassment has continued at the Tesla factory, and became more widespread, because despite their knowledge of the harassment, defendants have done nothing that could be reasonably expected to stop it."  Vaughn's legal action is the third lawsuit filed this year by black workers alleging that racial slurs were used against them and that the company ignored their complaints.)

[4]-https://www.google.com/amp/s/www.cbsnews.com/amp/news/tesla-million-melvin-berry-fremont-california-n-word-racial-discrimination/
- (Former Tesla employee who said supervisors called him the N-word awarded $1 million BY … Tesla has been ordered to pay roughly $1 million to a former employee who filed a legal complaint alleging he was called the N-word while working in the electric automaker's factory in California. Melvin Berry was hired by Tesla as a materials handler in 2015, but quit only 17 months later after being harassed on the job, … KKK signs and swastikas The Berry case is one of three racial discrimination lawsuits filed by former employees against Tesla since 2017.  In a class-action lawsuit representing more than 100 employees … Another Black employee said in

court documents that he had been called the N-word about 100 times and saw KKK signs and swastikas spray-painted on bathroom stalls.  In a third lawsuit, two former Tesla employees, a Black father and son, Owen Diaz and Demetric Di-az, also said they were subject to "severe and pervasive racial harassment" while working at the Fremont factory)

[5-]https://www.bloomberg.com/news/articles/2020-09-09/tesla-is-under-pressure-to-end-arbitration-for-racism-claims

- (Kristin Hull will have roughly three minutes to make the case against the company's use of mandatory arbitration for employee sexual harassment and racial discrimination claims.  Hull is the founder and chief executive of Nia Impact Capital, a social impact fund based in Oakland, California that invests in several sustainable energy companies.  Most people who work directly for Tesla sign away their rights to a trial. Hull wants to know how many discrimination and harassment cases go to arbitration, how much that's costing the company, and investors, and the demographics of those bringing the claims.  "We are in this to win this," said Hull during a socially distant interview in Oakland's historic Preservation Park, near Nia's office. "It's the issue of our time, and it's a Civil Rights issue.  "Arbitration is used as a form of claim suppression," Cliff Palefsky, a San Francisco employment lawyer, who has testified before Congress about mandatory arbitration, said of the practice broadly. "Instead of court, it's a secret tribunal with no right of appeal."  Tesla's board opposes the proposal…Tesla has faced multiple allegations of racial discrimination and harassment at its factory in Fremont, California,"..In recent years, Tesla has faced high profile allegations of racial discrimination at its Fremont plant, where roughly 10,000 people work. In late 2017, a Black worker, Marcus Vaughn, filed a lawsuit saying the plant was a "hotbed of racist behavior."...In 2018, Owen Diaz and his son Demetric filed suit as well, alleging a pattern of racial harassment and hostility. Demetric dropped his suit voluntarily, but Owen's case is slated for trial before a U.S. district court judge in San Francisco in October. The company said in an emailed statement to Bloomberg at the time that it takes discrimination and harassment of all forms "extremely seriously" and has a dedicated team focused on investigating and addressing workplace concerns. All three men were contract workers, so they never signed arbitration

agreements. Tesla argued that Vaughn's case shouldn't go to court anyway; the car-maker lost that appeal.)

[6]-https://www.reuters.com/article/us-tesla-lawsuit-racism-idUSKBN1YZ18E

- (A federal judge rejected Tesla Inc's effort to dismiss claims by two former workers that the California electric car factory where they worked was a hotbed of racial hostility, clearing the way for a possible trial.  In a decision on Monday, U.S. District Judge William Orrick in San Francisco found open questions over whether Owen Diaz and his son Demetric Di-az faced "severe and pervasive racial harassment" in 2015 and 2016 at Tesla's factory in suburban Fremont, … The plaintiffs, who are black, said they were subjected to repeated racial epithets dozens of times, as well as racist cartoons, and that supervisors engaged in or did little to stop the racism...Orrick said Diaz could pursue claims that Tesla allowed and did not take reasonable steps to stop racial harassment...He said punitive damages might be available if Tesla must have known about the harassment and "ratified" it, even if only lower level workers were directly involved…. The case will proceed to Trial.")

[7]-https://www.claimsjournal.com/news/national/2020/09/09/299249.htm

- (Since 2014, workers have filed 145 complaints with California's Department of Fair Employment and Housing alleging discrimination at Tesla on the basis of race, age, gender, disability, medical leave, pregnancy, sexual orientation, and national origin, according to a synopsis provided by the agency after a California Public Records Act request. This May, three separate people alleged they were forced to quit because of their race. While the state issued right-to-sue letters in all three cases allowing them to proceed in court, it's possible they'll be bound by arbitration clauses. Tesla did not respond to a request for comment on the complaints.
- Arbitration has long been the bane of employment discrimination lawyers. Instead of having a hearing before a jury, cases go in front of an arbitrator, which industry data shows are overwhelmingly older White men. Transcripts usually aren't available to the public, keeping bad actors out of the public eye and allowing inappropriate behavior to go unchecked.
- "The deck is stacked in a much less favorable way for employees," said Hilary Hammell, an employment discrimination attorney at Levy Vinick Burrell Hyams LLP in Oakland, who has written about how forced arbitration can hurt Black workers.  Employers, and their lawyers, argue that

the process is expedient, just, and cost-effective. And in the era of Covid-19, arbitration proceedings can be conducted remotely, while jury trials have largely ground to a halt…..For Hull, this isn't her first time pushing companies for more transparency. In June, she got 70% support from shareholders at cyber-security company Fortinet Inc. for a proposal requiring the firm to release an annual diversity report)

[8]-https://capitalandmain.com/tesla-workers-file-charges-with-national-labor-board-as-battle-with-elon-musk-intensifies-0419

- (Tesla Workers File Charges With National Labor Board as Battle With Elon Musk Intensifies...Workers at Tesla's Fremont, California electric car factory have filed a complaint with the National Labor Relations Board, accusing Elon Musk's company of illegal surveillance, coercion, intimidation and prevention of worker communications….. Workers at Tesla's Fremont, California electric car factory have filed a unfair labor practice charge with the National Labor Relations Board (NLRB), accusing the company of illegal surveillance, coercion, intimidation and prevention of worker communications. The employees, who have been attempting to organize the approximately 7,000 workers at the plant through the United Auto Workers, claim that Tesla violated multiple sections of the National Labor Relations Act, which protects the right to unionize.)

[9]-https://www.google.com/amp/s/www.nytimes.com/2018/11/30/business/tesla-factory-racism.amp.html

- (Owen Diaz, right, and his son, Demetric, said they had heard racial slurs directed toward them while working at the Tesla factory in Fremont, Calif. Owen Diaz, right, and his son, Demetric, said they had heard racial slurs directed toward them while working at the Tesla factory in Fremont, Calif.Credit...Ryan Christopher Jones for The New York Times Menial Tasks, Slurs and Swastikas: Many Black Workers at Tesla Say They Faced Racism African-American workers have reported threats, humiliation and barriers to promotion at the plant. The automaker says there is no pattern of bias…. Owen Diaz had seen swastikas in the bathrooms at Tesla's electric-car plant, and he had tried to ignore racist taunts around the factory. "You hear, 'Hey, boy, come here,' 'N-i-g-g-e-r,' you know, all this," said Mr. Diaz, who is African-American. Then, a few hours into his shift running the elevators, he noticed a drawing on a bale of cardboard. It had an oversize

mouth, big eyes and a bone stuck in the patch of hair scribbled over a long face, with "Booo" written underneath….On that winter night in the factory, when, he said, a supervisor admitted drawing the figure as a joke, Mr. Diaz had had enough. He typed a complaint to a Tesla manager on his phone. "Racist effigy & drawing" was the subject.

- "When you really just look at it, you ask yourself at some point, 'Where is my line?'" said Mr. Diaz, 50, who worked at the factory as a contractor for 11 months before he quit in May 2016….Interviews, internal communications and sworn legal statements filed by more than two dozen current or former Tesla employees and contractors describe a wide range of concerns among some African-American workers at the factory in Fremont, including threats by co-workers, demeaning assignments and barriers to advancement. Three lawsuits by former workers accusing Tesla of failing to curb racial discrimination and harassment have been filed since early last year, including one by Mr. Diaz awaiting trial."….One suit accusing Tesla of racial discrimination and harassment, filed last November in California Superior Court, seeks class-action status. The lawyers involved — Lawrence A. Organ and Bryan Schwartz, whose practices focus on workplace rights — say they have identified dozens of potential plaintiffs. Each lawyer has won multimillion-dollar judgments in other harassment or discrimination cases against major employers. Tesla is seeking to move the case into arbitration, which would require workers to bring individual lawsuits rather than a joint claim.

- The state's Department of Fair Employment and Housing says it has issued 10 "right to sue" letters — a precondition for a discrimination lawsuit — to employees complaining of racial bias at the Fremont plant. Dozens of other complaints against Tesla are pending, but the agency would not say how many involved race.  In an email to employees last year, which the company later released in response to one of the lawsuits, Elon Musk, Tesla's chief executive, warned against "being a huge jerk" to members of "a historically less represented group." At the same time, he wrote, "if someone is a jerk to you, but sincerely apologizes, it is important to be thick-skinned and accept that apology.")

[10]-https://www.industryweek.com/leadership/article/22024555/teslas-a-hotbed-for-racist-behavior-worker-claims-in-suit

- (Tesla's a Hotbed for Racist Behavior, Worker Claims in Suit - The employee says he's one of more than 100 African-American Tesla workers affected and is seeking permission from a judge to sue on behalf of the group….Tesla Inc.'s production floor is a "hotbed for racist behavior," an African-American employee claimed in a lawsuit in which he alleged black workers at the electric carmaker suffer severe and pervasive harassment. The employee says he's one of more than 100 African-American Tesla workers affected and is seeking permission from a judge to sue on behalf of the group. He's seeking unspecified general and punitive monetary damages as well as an order for Tesla to implement policies to prevent and correct harassment…."Although Tesla stands out as a groundbreaking company at the forefront of the electric car revolution, its standard operating procedure at the Tesla factory is pre-Civil Rights era race discrimination," the employee said in the complaint, filed Monday in California's Alameda County Superior Court….. The lawsuit was filed on behalf of Marcus Vaughn, who worked in the Fremont factory from April 23 to Oct. 31. Vaughn alleged that employees and supervisors regularly used the "N word" around him and other black colleagues. Vaughn said he complained in writing to human resources and Musk…..Larry Organ, an attorney at the California Civil Rights Law Group, said that Vaughn reached out to him after the law firm sued Tesla on behalf of other African American employees who complained about racial harassment this year. A Tesla assembly line worker sued in March, claiming the company did little to stop coworkers from harassing him.)

[11]-https://www.google.com/amp/s/www.businessinsider.com/tesla-workers-testimonies-recall-racism-being-called-n-word-slurs-2021-7%3famp

- (A Tesla factory worker said he was called the N-word '100 times' by coworkers, according to a sworn testimony….Former Tesla workers routinely used racial slurs against Black employees, according to sworn testimonies obtained by Protocol.  Aaron Craven, a Black worker at Tesla's Fremont factory, said in a sworn statement he had been called the N-word "approximately 100 times," and saw KKK signs and swastika graffitied in bathroom stalls. Workers submitted 103 declarations in March 2021 as part 2017 lawsuit suing Tesla for racial harassment.  "I was directly called n----- and n---- approximately 100 times at the Fremont factory," Craven said a

sworn statement reviewed by Protocol. "I heard the terms n----- and n----
used over 100 times by coworkers, and by my lead Auggie, in the Tesla
factory."Additionally, ex-contractor Aaron Minor stated he heard Tesla
employees refer to the Fremont factory as a plantation and Black people as
"cotton workers," Protocol reported.

- Two separate lawsuits filed against Tesla in 2017 alleged racial harassment
  and discrimination at the Fremont plant. Former Tesla worker DeWitt
  Lambert said coworkers regularly called him the N-word and made sexually
  explicit comments.  In 2019, Black and Latino workers at a Tesla factory in
  Buffalo, New York, filed discrimination complaints with the US Equal
  Employment Opportunity Commission (EEOC) and the New York Division
  of Human Rights. The six former workers said they heard racial slurs and
  racist comments at the factory.)

[12]-https://www.protocol.com/workplace/tesla-fremont-racism-discrimination

- (Racist graffiti, 'plantation' jokes and 100 potential lawsuits: Ex-workers say
  Tesla is still racist...The N-word, demeaning jokes and retaliation on the
  basis of race are all common at Tesla, according to 100-plus sworn
  statements from a class-action lawsuit and public records obtained by
  Protocol….When Aaron Craven clocked in to work every day at the Tesla
  Fremont factory, he knew he might hear or be called the N-word. When he
  walked into the bathroom stalls, he knew he might see graffiti of "KKK" or a
  swastika.
- "I was directly called n----- and n---- approximately 100 times at the
  Fremont factory," Craven said in a sworn statement. "I heard the terms n-----
  and n---- used over 100 times by co-workers, and by my lead Auggie, in the
  Tesla factory.  Former Tesla workers also called ex-contractor Aaron Minor
  "n-----," and Minor, too, found swastikas in the bathroom. Minor heard the
  factory called "the Plantation" and its Black employees "cotton workers."
  "My understanding is that people refer to the Tesla factory as the Plantation
  and call employees cotton workers because Tesla treats its Black employees
  like slaves," he wrote in a sworn statement.
- These sworn statements and 103 other declarations sworn under penalty of
  perjury comprise a 500-page exhibit filed in March 2021 as part of a 2017
  lawsuit that alleges Tesla discriminates against Black people and has allowed
  a racially hostile work environment to fester in its factories. The lawsuit's

allegations against the company are not unique:....Race-based complaints about Tesla are on average more common than the proportion of race-based complaints state-wide; while about 10% of all cases requesting right to sue were filed on the basis of race with the DFEH in 2020 (and less than that in previous years), more than 30% of the Tesla cases from 2018 to 2021 are based on allegations of racial discrimination.")

[13]-https://www.google.com/amp/s/www.latimes.com/business/technology/story/2021-08-05/ex-tesla-employee-called-racial-slur-wins-rare-1-million-reward%3f_amp=true

- (Ex-Tesla employee called a racial slur wins rare $1-million reward … a Black former employee who won a ruling after alleging that supervisors called him the "N-word" ….. Tesla Inc. has paid more than $1 million to a Black former employee who won a ruling that the company failed to stop his supervisors from calling him the "N-word" at the electric-car maker's Northern California plant.  The rare discrimination award by an arbitrator to Melvin Berry, which followed a closed-door proceeding, caps years of complaints from Black workers that Tesla turned a blind eye to the commonplace use of racial slurs on the assembly line and was slow to clean up graffiti with swastikas and other hate symbols scrawled in common areas. It ends a years-long and emotionally grueling fight launched by Berry, who was hired by the company as a materials handler in 2015 and quit less than 18 months later.

- Arbitration typically keeps disputes between employees and companies secret, but court filings reveal that the arbitrator found Berry's allegations more credible than Tesla's denials, though she called it a "difficult" case after hearing from witnesses on both sides. Berry claimed that when he confronted a supervisor for calling him the "N-word," he was forced to work longer hours and push a heavier cart…."I hope the world knows that an arbitrator found Tesla treats its employees like this," Berry, 47, told Bloomberg News in a phone interview Wednesday. He ..said he's now taking time off to focus on his mental health as he still hasn't "gotten over the healing process."…..," arbitrator Elaine Rushing said in her May 12 ruling, which hasn't been previously reported. Rushing, a former judge in Sonoma County Superior Court for almost two decades….. Rushing "was clearly troubled by the facts, culture at the company and the tone of the

defense."…..After his supervisors turned against him, Berry alleged, he suffered from sleepless nights, panic attacks, depression and anxiety, prompting him to seek help from a psychologist for the first time, according to the ruling. He broke down during the arbitration proceeding as he recalled how he "became quiet and cried a lot" and "questioned his sanity," Rushing wrote…….."This is a case of a 23-year-old White man with only a high-school education supervising a 43-year-old African-American man with a college degree, a classic invitation for serious resentment," she wrote…….In 2020, 31 complaints were filed with California's Department of Fair Employment and Housing alleging discrimination at Tesla on the basis of race, age, gender expression, disability and pregnancy, according to data obtained from public records. The state agency issued right-to-sue letters in a majority of the cases; a handful were closed with insufficient evidence. In July, Valerie Workman, Tesla's vice president of people, posted on the company's blog to remind employees about the use of slurs and epithets as they prepared to return to offices.")

[14]-https://www.google.com/amp/s/mobile.reuters.com/article/amp/idUSKBN1YZ18E

- (A federal judge rejected Tesla Inc's effort to dismiss claims by two former workers that the California electric car factory where they worked was a hotbed of racial hostility, clearing the way for a possible trial….In a decision on Monday, U.S. District Judge William Orrick in San Francisco found open questions over whether Owen Diaz and his son Demetric Di-az faced "severe and pervasive racial harassment" in 2015 and 2016 at Tesla's factory in suburban Fremont, which employs more than 10,000 people. The plaintiffs, who are black, said they were subjected to repeated racial epithets dozens of times, as well as racist cartoons, and that supervisors engaged in or did little to stop the racism….Orrick said Diaz could pursue claims that Tesla allowed and did not take reasonable steps to stop racial harassment.)

[15]-https://www.google.com/amp/s/futurism.com/tesla-pays-racial-slur/amp

- (TESLA PAYS FORMER EMPLOYEE $1 MILLION FOR CALLING HIM HORRIFIC RACIAL SLUR… "I HOPE THE WORLD KNOWS THAT AN ARBITRATOR FOUND TESLA TREATS ITS EMPLOYEES LIKE THIS." A former Tesla employee named Melvin Berry was awarded over $1 million in an arbitration hearing earlier this year after he filed complaints about

racist harassment at work — including his direct supervisor calling him the
N-word and then punishing him with longer hours of harder work for
speaking out about it.

- Toxic Culture…..Arbitrator Elaine Rushing decided that the evidence that
Berry — who quit after 18 months and dealt with panic attacks, depression,
and anxiety as a result — was harassed was clear…..“Racial discrimination
awards are rare and it seems this was especially hard-fought,” employment
lawyer Cliff Palefsky, who wasn’t involved in the case, told Bloomberg
News. Rushing, he added, “was clearly troubled by the facts, culture at the
company, and the tone of the defense.”)

[16]-https://www.sec.gov/Archives/edgar/data/1318605/000121465920005699/p61
2202px14a6g.htm

- (The resolution requests that Tesla’s Board of Directors oversee the
preparation of a report on the impact of the use of mandatory arbitration on
Tesla’s employees and workplace culture. The report should evaluate the
impact of Tesla’s current use of arbitration on the prevalence of harassment
and discrimination in its workplace and on employees’ ability to seek redress
should harassment and discrimination occur…..The proposal speaks to the
widespread experience in the economy of discrimination in the workplace by
African American, Hispanic and female employees, despite this
discrimination being unlawful under the Civil Rights Act of 1964. Those
companies that tolerate discrimination and harassment in their own
workplaces allow unnecessary legal, brand, financial, and human capital risk
within their companies. In contrast, studies show that companies with strong
workplace equity programs are more likely to outperform peers with poor
diversity programs.
- The use of mandatory arbitration in employee agreements limits employees’
remedies for wrongdoing,….Corporate Policies that Allow Harassment and
Discrimination Risk Investors’ Capital….Identified benefits of diverse teams
include: access to top talent, better understanding of consumer preferences, a
stronger mix of leadership skills, informed strategy discussions, and
improved risk management. Diversity, and the different perspectives it
encourages, has also been shown to encourage more creative and innovative
workplace environments.

- In contrast, companies where harassment and discrimination exist may experience reduced employee morale and productivity, increased absenteeism, challenges in attracting talent and difficulties in retaining talent. Employees directly experiencing workplace discrimination….Tesla employees have alleged harassment and discrimination on the basis of race and gender. A number of employees have come forward with allegations of harassment and discrimination at Tesla. While the company disputes these allegations on various grounds, the pattern of allegations is difficult for reasonable investors to ignore:
    - n 2017, AJ Vendermeyden alleged that she experienced harassment and discrimination as an engineer at Tesla's Fremont plant. According to Ms. Vendermeyden, a part of the factory was known to women as the "predator zone." While Tesla stated that it conducted investigations of Ms. Vendermeyden's claims and found them baseless, it held the case in arbitration, preventing it from going to court. Ms. Vendermeyden was eventually fired from Tesla. Tesla told The Guardian that Ms. Vendermeyden was fired for "falsely attacking our company in the press."13
    - In 2017, DeWitt Lambert alleged that he experienced harassment and violent threats while working at Tesla's Fremont, California. His allegation included recordings of co-workers stating "N***, we take your ass home, n***. Shred you up in pieces, n***. Cut you up, n***. Send your ass so everyone in yo family so everybody can have a piece of you, n***."14 In March of that year, Tesla general counsel, Todd Maron, wrote to Mr. Lambert's lawyers: "In terms of settlement, we are willing to pay Mr. Lambert [redacted], but only if we are to resolve this matter before there is media attention, preferably within the next few hours." He also wrote, "If there is media attention first, there will be no deal."15 Mr. Lambert's case was held in arbitration and Mr. Lambert was fired from Tesla. The company said that it had discovered problems with his conduct and work history.16
    - In November 2019, WIVB4, a local news station in Buffalo, reported that six African American and Hispanic Tesla workers had reported racist experiences in Tesla's Buffalo plant. As of February, 2020, WIVB4 reported that it was aware of twelve employees that had

inquired about filing complaints with the U.S. Equal Employment
Opportunity Commission and the state Division of Human Rights,
alleging a racist, hostile work environment. In its interviews, however,
employees spoke anonymously, given their fears of retaliation from
the company.)

[17]-https://www.google.com/amp/s/revealnews.org/article/how-tesla-and-its-docto
r-made-sure-injured-employees-didnt-get-workers-comp/

- (How Tesla and its doctor made sure injured employees didn't get workers'
  comp … Inside a medical clinic not far from Tesla's electric car factory,
  Yvette Bonnet started noting a troubling pattern. The automaker's workers'
  compensation manager would pressure her boss, Dr. Basil Besh, to make
  sure Tesla wasn't on the hook for certain injured workers.  And in her
  observation, Besh did whatever he could to not jeopardize his chance to run
  Tesla's on-site factory clinic.
- "He would say, 'I'm not losing the contract over this – get this case closed,'"
  said Bonnet, who was operations manager for Besh's Access Omnicare
  clinic in Fremont, California, for about a year.  "Besh wanted to make
  certain that we were doing what Tesla wanted so badly," she said. "He got
  the priorities messed up. It's supposed to be patients first."...)

[18]-https://jalopnik.com/tesla-pressured-doctors-to-block-workers-comp-benefits-
1833968118

- (Tesla Pressured Doctors to Block Workers Comp Benefits to Save Money:
  Report … Imagine getting shocked at work by an industrial electric current
  so severely that you fall backwards, urinate on yourself, and have pain,
  numbness, and balance problems. Third-party doctors subsequently confirm,
  yep, you were electrocuted.
- But then a manager from your employer steps in and says, no it was just
  minor static electric shock, like the kind you get when you touch a doorknob
  after walking on the rug, just so the company isn't on the hook for the
  associated medical costs with your treatment and doesn't have to report the
  workplace injury to regulators…..This is not the first time Reveal has
  brought to light sketchy workplaces practices from the electric car company.
  The news organization has previously reported on Tesla's practices of
  keeping workplace injuries off the books and providing questionable
  medical assistance on-site before sending workers back to the line.)

[19]-https://revealnews.org/podcast/working-through-the-pain-at-tesla/
- Working through the pain at Tesla...After being called out for hiding worker injuries at its factory, Tesla decides to double down….

[20]-https://revealnews.org/blog/tesla-fired-safety-official-for-reporting-unsafe-conditions-lawsuit-says/
- Tesla fired safety official for reporting unsafe conditions, lawsuit says … A former high-level safety official at Tesla Inc. has sued the company for failing to treat injured employees and for misclassifying work injuries to avoid reporting them as required by law...Carlos Ramirez, a director of environment, health, safety and sustainability at Tesla until June 2017, alleges he was fired in retaliation for reporting unsafe working conditions, such as chemical exposures and fires, and for refusing to go along with what he believed to be illegal practices.
- More from Insult to Injury…. An April investigation by Reveal from The Center for Investigative Reporting found that Tesla undercounted its workers' injuries, making the official injury rate look better than it actually was.  The suit also says Ramirez, who is Mexican American, faced harassment based on his race and national origin and that Tesla failed to address it.
- Ramirez previously worked as vice president of environmental, health and safety for SolarCity, a solar panel manufacturer Tesla acquired in 2016...Carlos Ramirez, a former safety official at Tesla Inc., sued the automaker for allegedly firing him in retaliation for reporting unsafe working conditions and safety violations. … After he came to Tesla, Ramirez and his team audited the company's internal injury tracking system, the suit says. The 2017 audit "revealed numerous instances of lack of treatment of Tesla employees that suffered workplace injuries, recordkeeping violations, and improper classification of workplace injuries to avoid treating and reporting workplace injuries," it says.

[21]-https://revealnews.org/blog/im-not-who-i-used-to-be-severely-injured-worker-sues-tesla/
- Severely injured worker sues Tesla: 'I'm not who I used to be'...Chuong Nguyen (left) helps look after his brother, Son, as he recovers from a severe burn injury at Tesla's car factory in 2017….A man severely burned in an electrical explosion at Tesla's car factory is suing the automaker for

allegedly putting him in harm's way "in order to increase productivity at the expense of human lives."

- Son Nguyen was working as a contractor at the Fremont, California, factory on June 5, 2017, when an explosion called an arc flash threw him back 15 to 20 feet and engulfed him in flames...More from Insult to Injury...Nguyen's lawsuit says Tesla should have cut electricity to the equipment he was working on, but refused to because the company didn't want to temporarily stop production.

- Nearly a year later, he is in constant pain and covered in scars and skin grafts, his pinky finger amputated, a compression garment covering him from head to knees. Nerve pain, which he says feels like "thousands of pins and needles poking you," keeps him up at night. He struggles with basic tasks and dreads the surgeries to come…."I don't want anybody to go through what I went through,"

[22]-https://revealnews.org/blog/tesla-hit-by-government-investigation-after-reveal-story/

- Tesla hit by government investigation after Reveal story…..Tesla officials Laurie Shelby (left) and Gaby Toledano read the concerns of then-safety lead Justine White, who emailed CEO Elon Musk's chief of staff in 2016. "I know what can keep a person up at night regarding safety," she wrote. "I must tell you that I can't sleep here at Tesla."....California's workplace safety agency opened an investigation of Tesla Inc. on Tuesday, the day after Reveal from The Center for Investigative Reporting published an investigation of safety problems and unreported injuries at the carmaker's Fremont factory.

- Reveal found that Tesla did not count all of its work injuries as required by law, making its safety record look better than it actually is…."Cal/OSHA takes seriously reports of workplace hazards and allegations of employers' underreporting recordable work-related injuries and illnesses," said Erika Monterroza, spokeswoman for the state Department of Industrial Relations, which includes the Division of Occupational Safety and Health, known as Cal/OSHA…..Cal/OSHA has cited Tesla for more than 40 health and safety violations since 2013. This year, the agency cited the company for failing to provide employees with effective information and training on chemical

hazards in their work areas, as well as failing to "effectively assess the workplace" for chemical hazards.

- [23]-https://revealnews.org/article/inside-teslas-factory-a-medical-clinic-designed-to-ignore-injured-workers/
  - INSULT TO INJURY - Inside Tesla's factory, a medical clinic designed to ignore injured workers …. Former Tesla worker Stephon Nelson clutches his back as he climbs steps outside his girlfriend's home in Oakland, Calif. He was injured in August while working in the trunk of a Model X. Something slipped and its hatchback crunched down on his back. … When a worker gets smashed by a car part on Tesla's factory floor, medical staff are forbidden from calling 911 without permission.

  - The electric carmaker's contract doctors rarely grant it, instead often insisting that seriously injured workers – including one who severed the top of a finger – be sent to the emergency room in a Lyft….Injured employees have been systematically sent back to the production line to work through their pain with no modifications, according to former clinic employees, Tesla factory workers and medical records. Some could barely walk.

  - The on-site medical clinic serving some 10,000 employees at Tesla Inc.'s California assembly plant has failed to properly care for seriously hurt workers, an investigation by Reveal from The Center for Investigative Reporting has found…..The clinic's practices are unsafe and unethical, five former clinic employees said….But denying medical care and work restrictions to injured workers is good for one thing: making real injuries disappear. "The goal of the clinic was to keep as many patients off of the books as possible," said Anna Watson, a physician assistant who worked at Tesla's medical clinic for three weeks in August…..Watson has nearly 20 years of experience as a medical professional

[24]-https://www.google.com/amp/s/nypost.com/2021/07/07/ex-tesla-worker-says-he-was-called-n-word-100-times-by-coworkers/amp/
[25]-https://www.gwclaw.com/blog/tesla-minimizing-work-injuries/

[26]-https://www.audacy.com/kcbsradio/blogs/doug-sovern/tesla-fined-california-lack-workers-compensation-janitors
- The state of California is fining Tesla ...The California Labor Commissioner has cited and fined Tesla Energy Operations and its previous subcontractor ... each for violating state labor laws….The company was not paying for workers compensation insurance,"

[27]-https://www.bloomberg.com/news/articles/2019-09-27/tesla-committed-unfair-labor-practices-nlrb-judge-rules
- tesla-committed-unfair-labor-practices-nlrb-judge-rules

[28]-https://www.gwclaw.com/blog/tesla-minimizing-work-injuries/

[29]-http://www.janitorialwatch.org/2019/10/24/tesla-and-its-contractors-again-cited-and-fined-for-labor-violations-in-california/
- Tesla and its Contractors Again Cited and Fined for Labor Violations in California
- October 24, 2019 / Press Release.. For the second time in recent months, an investigation from the Maintenance Cooperation Trust Fund has turned into a citation from the state LOS ANGELES – The State of California has cited Tesla and its janitorial contractors for not paying janitors their full wages at one of Tesla's San Jose facilities.
- Workers who cleaned the facility between 2015 and 2018 were underpaid for the hours they worked, workers received checks with no deductions statement, and were misclassified as independent contractors. Tesla's contractors, Leonardo Valencia and Orbit USA, LLC were cited and owe $370,000 for willfully misclassifying workers, including workers who worked at the Tesla facility. Leonardo Valencia and Orbit USA, LLC were also cited for underpaid work at the Tesla facility and other locations. Tesla was cited for more than $30,000 for violations of minimum wage and overtime requirements, meal and rest period violations, failure to comply with itemized statement provision, plus additional penalties.
- "Too often, subcontractors have overworked and underpaid janitors with no consequences. New California laws help to give workers more protections and hold companies like Tesla responsible," said Rafael Ventura, Interim Executive Director. "Tesla must stop using contractors who evade the law and exploit their workers to make their bottom line."

- "I was misclassified as an independent contractor so my employer could cut costs, even though I worked at Tesla full time," said Santiago Paz. "I was denied overtime and my workers' rights. I worked hard and I deserve to be paid fairly."
- Wage theft (and these types of labor code violations are a wide spread problem - Addenda ref). The company itself, as well as its subcontractors, as well as these particular subcontractors, who they (Tesla) also have a legal duty to ensure paid, and worker's compensation according to rulings … (see addenda - see specific rulings from them).

[30]-Tesla's new gigafactory will highlight the 2 biggest labor trends in America - Transmosis CyberOps Small Business AI Cybersecurity Software

[31]-This Week in Threats to Workers' Rights - Pacific Standard

[32]- Report: Wage Theft is Pervasive in Corporate America | Good Jobs First
- (A new report finds that many large corporations operating in the United States have boosted their profits by forcing employees to work off the clock, cheating them out of required overtime pay and engaging in similar practices that together are known as wage theft.)

[33] - Tesla | Today's Workplace
- (Hiding Injuries at Tesla: Where The Worker Still Doesn't Matter, Under-recording of workplace injuries and illnesses is bad, and far too common. But at the automaker Tesla, in Fremont, California, under-recording is more than a paper exercise in deception — at Tesla it means withholding needed medical treatment of injured workers so that their injuries aren't report on OSHA logs. We wrote previously about reports that workers are getting hurt at Tesla and that many of those injuries are not being recorded.... CalOSHA has inspected the company a number of times and found recordkeeping violations.  Now Evans shows the many ways that Tesla is keeping injuries off the OSHA logs.)

[34] -Tesla factory workers stiffed on overtime, denied breaks: lawsuit
- (Tesla factory workers stiffed on overtime, denied breaks: lawsuit, Tesla and a contracting company failed to pay contract workers fully for overtime and denied them legally mandated meal and rest breaks, a contract employee at Tesla's Fremont auto-assembly plant said in a lawsuit that also claims she

was fired for complaining about employee-payment practices….Nezbeth-Altimore's lawsuit, filed April 19 in Alameda County Superior Court, is not the only contractor-related legal action facing the company. A lawsuit by three African American men,  hired through workplace-staffing agencies to work at the Fremont factory, alleges that the company led by CEO Elon Musk oversaw a work environment hostile to black people, featuring racial epithets and racist graffiti.)

[35] -Elon Musk apologizes for Tesla workers paid just $5 an hour by subcontractor | Tesla | The Guardian

[36] -Tesla Fined for Labor Violations, Second Investigation by the State of California Ongoing - The Maintenance Cooperation Trust Fund

[37] - Tesla's $1 Million Settlement of Wage Claims Gets Final Approval

[38] - Tesla Fined By California For Lack Of Workers Compensation For Janitors

[39] -What is Wage Theft and How to Know if You're a Victim of it | Money
- (Wage Theft Costs American Workers Billions Each Year.A  2017 study from the Economic Policy Institute (EPI) found that 2.4 million employees across the ten largest U.S. states lost $8 billion annually to just one form of wage theft)

[40] - Exposing Wage Theft Without Fear - National Employment Law Project
- (workers face an especially high risk of retaliation along with potentially more devastating consequences. On a daily basis, workers who want to assert their basic rights risk not only their job and income, but also their long-term economic security, trauma...Why Do Workers Experience Retaliation?  Workers in the U.S. generally bear the burden of enforcing their own labor protections—it is up to them to come forward to report violations.  When a worker comes forward to report a workplace violation, we know that employers often retaliate or threaten to retaliate against the worker.  ·Under our current system, workers bear the entire risk of retaliation from their employer when they report violations.   What Does Retaliation Look Like?   Retaliation takes many shapes and can be difficult

to pinpoint or prove. Employers, for example, may fire a worker, demote a worker, reduce a worker's hours, change worker's schedule to a less favorable one, subject a worker to new forms of harassment, unfairly discipline a worker, threaten to report a worker or a worker's family member to immigration authorities, and much more.)

[41] Editorial: Tesla worker betrayal brings call for action (East Bay Times) – East Bay Times

- (The Sunday story by the Bay Area News Group's Louis Hansen about the hidden workforce that expanded Tesla's Fremont factory was shocking. It raises red flags about labor practices and B1 visa abuses throughout the Bay Area.  The betrayal by Tesla is especially disappointing. The cutting-edge carmaker was regarded as the role model for bringing manufacturing jobs back to California. It was the prototype feel-good, green industry that paid its skilled workers a premium for their ultra-productive work.  But not the workers imported to build the expansion of the state-of-the-art plant. They were hired through a contractor and paid the wages they would make in their own impoverished countries, $5 an hour in some cases.  In a formal response to the story Monday, Tesla issued a statement saying "mistakes were made" and the company pledged to "put in place additional oversight to ensure that our workplace rules are followed even by sub-subcontractors to prevent such a thing from happening again.")

[42] Elon Musk's SpaceX shortchanged its workers and now it must pay

- In 2014, a handful of former employees claiming unfair compensation brought suits against SpaceX that California courts …. company agreed to settle in August 2016 and finalized a settlement for about $4 million in May

[43] https://www.teslarati.com/tesla-factory-workers-file-charges-labor-board/

- unfair labor practice charge, alleging illegal surveillance, coercion, intimidation and prevention of worker communications by Tesla

[44] https://www.cnbc.com/2017/04/25/workers-involved-in-union-activities-say-tesla-is-illegally-intimidating-them.html

[45] https://www.reuters.com/article/us-tesla-union/uaw-accuses-musk-of-threatening-tesla-workers-over-unionization-idUSKCN1IP2XS

[46]-https://www.vox.com/identities/2019/9/30/20891314/elon-musk-tesla-labor-violation-nlrb