UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


GEORGE J. AUSTIN, Plaintiff,                          MOTION FOR CLARIFICATION

v.

TESLA, et. al. Defendants.

Court of Appeals Docket # 21 - 15151
(from District Court # 3:20-cv-00800)

## MOTION FOR CLARIFICATION

Mr. George Jarvis Austin, Pro Se, moves the Court to verify that the Principal Appellant Response Brief requirements are essentially the same as the Opening Brief.   Because Plaintiff/Appellant wants to highlight another key aspect (based on already plead facts), intentional discrimination under 1981, Plaintiff wants to double check Principal Response Brief requirements per FRAP 28.1 are broadly the lesser of 14,000 words, or 50pgs.  Plaintiff/Appellant moves the Court for verification of those requirements. cdn.ca9.uscourts.gov/datastore/uploads/rules/frap.pdf

A statement in Appellant's Opening Brief, along with a few initial quotes, and citations, helps to frame, and capture (especially in context of recent litigation with Tesla, the underlying 1981 colorable, and cognizable, harms:

> "As mentioned in the Tesla Coverage "N*gg*r" is an aged term designed to demean, humiliate, strip away rights, and control, …. Black people during a time of mass enslavement, (www.nytimes.com/2018/11/30/business/tesla-factory-racism.html; https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-1107-tesla-diaz-black-confidence-20211105-ultlahzhijes7bqks6j2uiefla-story.html;www.blackenterprise.com/black-ex-tesla-employee-awarded-more-than-1-million-after-company-fails-to-stop-supervisors-from-calling-him-the-n-word/ in many ways falsely labeling a Black man a "criminal" (*through word, or deed*) in modern parlance,  in a time of mass incarceration is its equivalent and serves the same nefarious purposes  (demean, humiliate, strip away rights, and control - especially when acting on this assumption.. Because we live in live in the first prison society according to Loic Wacquant (who Professor Seidman cites), with largest population of prisoners on the planet, with an over representation of Black men incarcerated, it is hard to overestimate the negative repercussion of a false criminal accusation.
>
> - Plaintiff(and Appellant), **George Jarvis Austin**, Attorney of Record, Pro Se, in Opening Tesla Brief No. #21-15151, Ninth Circuit (after experiencing wage theft, retaliation, defamation, etc. as well as other labor and safety code violations) referencing *Elizabeth Hinton; DeAnza Cook*, The mass criminalization of Black Americans: A historical overview, 4 Annual Review of Criminology 261–286 (2021).  See also *Louis Michael Seidman*, Hyper-Incarceration and Strategies of Disruption: Is There a WayOut?, 9 OHIO ST. J. CRIM. L. 109 (2011)

> "When we think of racism we think of Governor Wallace of Alabama blocking the schoolhouse door (https://www.businessinsider.com/george-wallaces-stand-in-the-school-house-door-2013-6) ; we think of water hoses, lynchings, racial epithets, and "Whites only" signs. These images make it easy to forget that many wonderful, goodhearted white people who were generous to others, respectful of their neighbors, and even kind to their Black maids, gardeners, or shoe shiners--and wished them well--nevertheless went to the polls and voted for racial segregation... Our understanding of racism is therefore shaped by the most extreme expressions of individual bigotry, not by the way in which it functions naturally, almost invisibly (and sometimes with genuinely benign intent), when it is embedded in the structure of a social system….In the era of colorblindness, it is no longer socially permissible to use race, explicitly, as a justification for

discrimination, exclusion, and social contempt….Rather than rely on race, we use our criminal justice system to label people of color "criminals" and then engage in all the practices we supposedly left behind….As a criminal, you have scarcely more rights, and arguably less respect, than a Black man living in Alabama at the height of Jim Crow. We have not ended racial caste in America; we have merely redesigned it."

> — **Michelle Alexander,** The New Jim Crow:
> Mass Incarceration in the Age of Colorblindness

"The synonymy of Blackness with criminality is not a new phenomenon in America. Documented historical accounts have shown how myths, stereotypes, and racist ideologies led to discriminatory policies and court rulings that fueled racial violence in a post-Reconstruction era and has culminated in the exponential increase of Black male incarceration today. Misconceptions and prejudices manufactured and disseminated through various channels such as the media included references to a "brute" image of Black males. In the 21st century, this negative imagery of Black males has frequently utilized the negative connotation of the terminology "thug." In recent years, law enforcement agencies have unreasonably used deadly force on Black males allegedly considered to be "suspects" or "persons of interest." The exploitation of these often-targeted victims' criminal records, physical appearances, or misperceived attributes has been used to justify their unlawful deaths... the connection between disproportionate criminality and Black masculinity"

> -   **Calvin John Smiley and David Fakunle** From "brute" to "thug:" the demonization and
>     criminalization of unarmed Black male victims in America, Abstract

"Time and again, powerful and brilliant men and women have produced racist ideas in order to justify the racist policies of their era, in order to redirect the blame for their era's racial disparities away from those policies and onto Black people (and sometimes using Black People to do so)…. The principal function of racist ideas in American history has been the suppression of resistance to racial discrimination and its resulting racial disparities. The beneficiaries of slavery, segregation, and mass incarceration have produced racist ideas of Black people being best suited for or deserving of the confines of slavery, segregation, or the jail cell. Consumers of these racist ideas have been led to believe there is something wrong with Black people, and not the policies that have enslaved, oppressed, and confined so many Black people."

> — **Ibram X. Kendi**, Stamped from the Beginning:
> The Definitive History of Racist Ideas in America

**Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1140-41 (9th Cir. 2005)** ("As discussed above in the analysis of the Supreme Court's holding in Reeves in section II.C., **credibility attacks alone may provide enough circumstantial evidence to support a finding of intentional discrimination** if no legitimate reasons for different treatment remain. While direct evidence of discriminatory intent, such as racial slurs, could further support such a finding, they are not required if a prima facie case has been established and the plaintiff presents "specific" and "substantial" "circumstantial evidence that tends to show that the … proffered motives were not the actual motives because they are inconsistent or otherwise not believable." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998).")

Appellant, a Black man, injured on the job at Tesla, qualifying under definition of disability

and requiring augmented work schedule, and ordered to go to Tesla clinic day of retaliatory

actions, and ultimately retaliatory discharge would qualify under both Labor Code, and section

1981 (especially the racially charged discriminatory criminal accusation used as pre-text, to not only deprive Plaintiff of Contract privileges, etc. but refuse to answer the questions about the pay issues regarding several weeks of missing overtime pay [and still wasn't paid]).  See e.g. Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1140-41 (9th Cir. 2005) ("credibility attacks alone may provide enough circumstantial evidence to support a finding of intentional discrimination)

Similar to the surrounding facts of the recent $137 million dollar jury award, and Arbitrator's comments regarding the seriously problematic company culture and response pattern to Black people, and specifically the Black man, and person, being called "n-word" Mr. Austin's pleadings raised major issues with explicit racial overtones, and intentional discriminatory conduct exhibited during (pre, and post) retaliatory negative employment actions which are also sufficient, and cognizable harm, under 1981.  See www.theguardian.com/technology/2022/feb/18 /tesla-california-racial-harassment-discrimination-lawsuit.  See also www.blackenterprise.com/ black-ex-tesla-employee-awarded-more-than-1-million-after-company-fails-to-stop-supervisors-fro m-calling-him-the-n-word/.  See also www.nytimes.com/2021/10/04/business/tesla-racism -lawsuit.html See also  Richardson v. Restaurant Marketing Associates, Inc., 527 F. Supp. 690, 694-95 (N.D. Cal. 1981) ("Defendant's own actions proved that plaintiff's fear of retaliatory discharge was entirely justified, and the evidence …amply supported …claim [of] … racist atmosphere…denied the benefits of a work environment conducive to inter-racial harmony and association pursuant to Title VII and 42 U.S.C. § 1981 . Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 113 n. 26, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979); Des Vergnes v. Seekonk Water District, 601 F.2d 9, 14 (1st Cir. 1979); Waters v. Heublein, Inc., 547 F.2d 466 (9th Cir. 1976), cert. denied, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977); Bartelson v. Dean Witter Co., 86 F.R.D. 657, 665 (E.D.Pa. 1980); National Organization for Women v. Sperry Rand

Corp, 457 F. Supp. 1338 (D.Conn. 1978). 4. A substantial factor in defendant's decision to

terminate plaintiff Simmons' was his race. Whiting v. Jackson State University, 616 F.2d 116, 121

(5th Cir. 1980); Williams v. Anderson, 562 F.2d 1081, 1094 (8th Cir. 1977) (§ 1983); Smith v. Sol

D. Adler Realty Co., 436 F.2d 344, 349, 350 (7th Cir. 1970) (§ 1982). Defendant's termination of

plaintiff Simmons was a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 . 5. A

substantial factor in defendant's decision to [take negative employment action against] plaintiff …

was his race. Whiting v. Jackson State University; King v. Laborers International Union of North

America, Local No. 818, 443 F.2d 273, 278, 279 (6th Cir. 1971); Slack v. Havens, 8 Empl. Prac.

Dec. ¶ 9492, page 5219 (S.D.Cal. 1973), aff'd, 522 F.2d 1091 (9th Cir. 1975). Gay v. Waiters' and

Dairy Lunchmen's Union, Local 30, 489 F. Supp. 282 (N.D.Cal. 1980)")

     For example Mr. Austin, a Black man, plead he worked multiple over-time days, and

weeks (more than 40 hours), as the structure of that work at Tesla is literally everyday, and nearly

every week, work hours accumulate Overtime (and Mr. Austin was not paid at least one week of

the multiple weeks of overtime, and made complaints to correct that issue, repeatedly, leading up to

HR meeting with HR Officer that preceded retaliation days later).  No more are the "badges and

incidents of slavery" demonstrated by an employer in refusal to pay a Black person, timely, for

their work (as enslavement in this country was Black people working for free).  See e.g. Jones v.

Mayer Co., 392 U.S. 409, 410 (1968) ("The Thirteenth Amendment authorized Congress to do

more than merely dissolve the legal bond by which the Negro slave was held to his master; it gave

Congress the power rationally to determine what are the badges and the incidents of slavery and

the authority to translate that determination into effective legislation. Pp. 439-440.(c) Whatever else

they may have encompassed, the badges and incidents of slavery that the Thirteenth Amendment

empowered Congress to eliminate included restraints upon "those fundamental rights which are the

essence of civil freedom, namely, the same right"... as is enjoyed by white citizens).  See Johnson

v. Lucent Technologies Inc., 653 F.3d 1000, 1006 (9th Cir. 2011) (""make and enforce contracts"

language in § 1981 to include the "termination of contracts, and the enjoyment of all benefits,

privileges, terms, and conditions of the contractual relationship." Id. at 383, 124 S.Ct. 1836

(quoting 42 U.S.C. § 1981 (b)).")  See also e.g.  Metoyer v. Chassman, 504 F.3d 919, 935 (9th Cir.

2007) ("Section 1981 prohibits discrimination in the "benefits, privileges, terms, and conditions" of

employment, see 42 U.S.C. § 1981 (b); see also Bains LLC v. Arco Products Co., Div. of Atlantic

Richfield Co., 405 F.3d 764, 769 n. 3 (9th Cir. 2005), …employee … pay [and labor code safety

issues]  qualify as a privilege, term, or condition of employment. See, e.g., Hishon v. King

Spalding, 467 U.S. 69, 75, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984**).")**  The problematic culture is

evidenced many times over as  "Workers referred to the factory as the 'slaveship' or 'the

plantation', where defendants' production leads 'crack the whip'," refusing to pay a Black person,

timely, and then retaliating (with racially charged, and false, pre-text) is the essence of intentional

discrimination.  See www.theguardian.com/technology/2022/feb/18/ tesla-california-racial-

harassment-discrimination-lawsuit.

The courage required to stand up for yourself, as Black person, as Mr. Austin did (via

complaints, proactive communication, follow up, etc.), in that context, becomes more evident when

the culture is not only discriminatory against them, but retaliatory (triggering Company legal

liability).  See e.g. Metoyer v. Chassman, 504 F.3d 919, 937 (9th Cir. 2007) ("bigoted remarks

…may tend to show discrimination, even if directed at someone other than the plaintiff. Cordova v.

State Farm Ins. Cos., 124 F.3d 1145, 1149 (9th Cir. 1997). Furthermore, we have held that remarks

by such a decision-maker tend to show bias, even if several years old. See Mustafa v. Clark

County School Dist, 157 F.3d 1169, 1179-80 (9th Cir. 1998).")  See also Woods v. Graphic

Commc'ns, 925 F.2d 1195, 1200-01 (9th Cir. 1991) ("697 F.2d 1297, 1304 (9th Cir. 1982) (Courts

have long recognized that a workplace in which racial hostility is pervasive constitutes a form of

discrimination. See Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971),  … [there is] an

affirmative obligation to oppose employment discrimination … If instead it acquiesced or joined in

… discrimination practices , it too is liable to the injured employees....affirmative duty to combat

discrimination in the workplace. Id. It did not rely on this duty to find liability, however, because

the acts … constituted more than mere passivity. … deliberate choice not to process grievances,

since the evidence proved "`far more' than mere passivity." ….. Racial harassment is a form of

discrimination usually charged against an employer because the claim is grounded in the fact that

the offensive conduct alters the "terms and conditions of employment." …. assumed responsibility

for preventing discrimination in terms and conditions of employment. "The same reasons which

prohibit an employer from discriminating on the basis of race "). Tesla, and joint employers, not

only failed their affirmative duties, but intensified, and took company liability further, by

acknowledging receipt of formal complaints, and instead of correcting intentionally discriminatory

behaviors, intensified them through retaliation shortly after HR meeting Plaintiff requested per Vice

Presidents suggestion for promotion.

Because Mr. Austin worked, above and beyond, additional days nearly every week to the

point a supervisor/manager even inquired as to why I was working so hard, and attempted to put a

cap on how much overtime I could work (*compounding amount missing unpaid overtime which

according to State of California Auditing and Accounting Department Plaintiff was not only

underpaid (at minimum approx 25K), but verified those findings of fact, disclosed to the Court,

under penalty of perjury by Defendant Employers*) the initial discriminatory violations of refusingto

pay Black person, timely, is clear.  However, due to Mr. Austin's protected activity (complaints to

supervisors, HR, management, and company officers, etc.) regarding unpaid overtime, Health and

Safety, and other violations for multiple weeks leading to adverse employment activity (wrongful

termination based on defamatory, racially charged, false accusation of criminal recording),

apparently as pretext, only days after meeting with HR Officer Tesla's, and joining employer's,

conduct are not only sufficient under FLSA retaliation standard (as articulated by this Circuit's

*Rosenfield*, and the Supreme Court's *Kasten*), but also intentionally discriminatory Retaliation

standards under 1981.  See Metoyer v. Chassman, 504 F.3d 919, 939 (9th Cir. 2007) ("The direct

evidence of retaliatory intent … for … engagement in protected activity, and the timing of the

suspension, which ultimately resulted in … termination, raises a triable issue of fact as to the §

1981 retaliation claim.")  See also Johnson v. Lucent Technologies Inc., 653 F.3d 1000, 1007 (9th

Cir. 2011) (" § 1981 retaliation claim is subject to the four-year statute of limitations")

  Jointly responsible Employers added insult to literal injury via their retaliation as plaintiff

had a. suffered on the job injury, b. was continually being treated in Tesla Clinic, and c. had

required augmented work duties/schedule due to injury while making complaints including the

meeting with HR Officer (for which Plaintiff was fraudulently induced into going on the basis of

promotion and ensuring payment of unpaid overtime), yet completely opposite was retaliated

against, is still injured  (and to date has never received Workers compensation, after over 600 days

from injury).  "Fair notice" to liable joint employer's was provided and response from their

representatives confirms they understood the level of seriousness of complaints.  One said as

mentioned "you are barking up the wrong tree," the HR Officer said in Tesla meeting prior to

retaliation against  Appellant, George Jarvis Austin "you shouldn't have to deal with that and take

the rest of the day of paid [Paraphrased] (prior to retaliating two days or so later)."  See e.g.

Richardson v. Restaurant Marketing Associates, Inc., 527 F. Supp. 690, 695 (N.D. Cal. 1981)

("Plaintiff … was fired in retaliation for [making formal complaint] against defendant. Hicks v.

ABT Associates, Inc., 572 F.2d 960, 969 (3rd Cir. 1978); Macey v. World Airways, Inc., 14 Fair

Empl. Prac. Cas. 1426 (N.D.Cal. 1977). A retaliatory discharge of this type is a violation not only

of Title VII but also of the Civil Rights Act of 1866, 42 U.S.C. § 1981 . Winston v. Lear-Siegler,

Inc., 558 F.2d 1266 (6th Cir. 1977); DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2nd

Cir.), modified, 520 F.2d 409 (2nd Cir. 1975); Crawford v. Roadway Express, Inc., 485 F. Supp.

914, 922 (W.D.La. 1980).")  See also Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir. 2007)

(""When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual

motivation of the employer is created even if the evidence is not substantial." Godwin v. Hunt

Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998); see also Wallis v. J.R. Simplot Co., 26 F.3d

885, 889 (9th Cir. 1994) (concluding that on summary judgment, "[t]he requisite degree of proof

necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level

of a preponderance of the evidence").")

Plaintiff/Appellant, Pro Se, made clear leading up to that conversation orally and in writing

that there were unpaid overtime wages, and other pay, and time-log discrepancies that needed

correction with management supervisors, HR Officers, etc.   Plaintiff worked so much overtime

whereas management team member inquired into why I was working so hard, and so much, and

attempted to put a cap/limit on how much I worked.  A variety of persons were provided fair notice

including, but not limited to: Jerome Guillen <jerome@tesla.com ; (who apparently took over for

Bert Bruggeman), Freddy Rivera <frivera@tesla.com ), multiple Supervisors, Deputy General

Counsel Yusef Mohamed  Ymohamed@tesla.com),  who Bert made intro to when saying I,

Appellant, was too smart to work in that Department given skills, intelligence, background and

pedigree, etc.), Elon Musk erm@tesla.com  (Elon Musk), and management at Tesla prior to HR

meeting with Vince Woodard, HR Officer, vwoodard@tesla.com  from personal and my Tesla

company email geaustin@tesla.com.  All were informed prior to, and after, retaliatory, defamatory,

and negative employment action was made after Plaintiff/Appellant wage, health and safety,

record-keeping and other complaints.

       Because Mr. Austin, Pro Se, also made clear Health and Safety Code violations, while

being injured on the job, while still being treated in Tesla Clinic for those leg injuries, and is still

suffering from that injury 600+ days later, and still hasn't received Workers compensation (i.e.

treated in an inferior manner) the intentionally discriminatory patterns are clear.  See Austin v

Atlina, et. al.  Prior to work related injury at Tesla Plaintiff could ride an outside mountain bike,

play basketball, and other activities, yet since injury to date has not been able to engage due to leg

pains and mobility limitations.  From initial complaint the State of California, Auditing and

Accounting, Department has since proven the veracity of his wage complaints and even confirmed

a minimum amount of unpaid wages, and the specific account number from Defendant/Appellee

Employers, when Investigating the wage documents with liable joint employers under the penalty

of perjury (submitted to them by George Jarvis Austin prior to paying him maximum weekly

benefits based on audited wages due to back injury from an non-work car accident).  See e.g.

Metoyer v. Chassman, 504 F.3d 919, 937 (9th Cir. 2007) ("can prove discrimination in privileges

of employment on the basis of discriminatory denial of benefits that were not included in her

contract. See Hishon, 467 U.S. at 75, 104 S.Ct. 2229 ("An employer may provide its employees

with many benefits that it is under no obligation to furnish by any express or implied contract.").

But this benefit must be "part and parcel of the employment relationship." Id. For example in

Hishon, the Supreme Court held that "the opportunity to become a partner [in a law firm] was part

and parcel of an associate's status as an employee [at the law firm]." Id. at 76, 104 S.Ct. 2229")

Defendant Employers are jointly responsible for Retaliation and Civil Rights violations (including 1981) due to employer retaliation because of FLSA violation, and other Health and Safety Code   See Woods v. Graphic Commc'ns, 925 F.2d 1195, 1202-03 (9th Cir. 1991) ("Under 42 U.S.C. § 1981 , "all persons" are guaranteed the "same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." … a (entity), entrusted with the enforcement of a labor contract, may violate the statute (1981) if by racial discrimination it interferes with … ability to enforce their contract.")  As articulated in *Chao*, the initial violations, compounded by the reckless disregard, and malicious retaliation was not only willful, but discriminatory.  See Chao v. A-One Med. Servs., Inc., 346 F.3d 908, 918 (9th Cir. 2003) ("A violation of the FLSA is willful if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA ].")  See Alvarez, 339 F.3d 894, 2003 WL 21788995, 2003 U.S.App. LEXIS 15622, at *37 ("was on notice of its FLSA requirements, yet took no affirmative action to assure compliance with them. To the contrary, ... actions may more properly be characterized as attempts to evade compliance. . . .")")  See also Metoyer v. Chassman, 504 F.3d 919, 933 (9th Cir. 2007) ("any discrimination that is actually shown to play a role in a contested employment decision may be the subject of liability.")

Because Mr. Austin, Pro Se, wants to highlight another key aspect (based on already plead facts), intentional discrimination under 1981, Plaintiff wants to double check Principal Response Brief requirements per FRAP 28.1 are broadly the lesser of 14,000 words, or 50pgs.  Thus, Mr. Austin moves the Court for verification of those requirements. cdn.ca9.uscourts.gov/datastore/uploads/rules/frap.pdf.